1

1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF MARYLAND

3

4    UNITED STATES OF AMERICA

5        VS.                      CRIMINAL NO. CCB-08-0142

6    DAVID S. SHANTON, SR.

7                    DEFENDANT

8
                                    Baltimore, Maryland
9
                                    July 9, 2008
10

11

12       The above-entitled case came on for a motions

13   hearing before the Honorable Catherine C. Blake,

14   United States District Judge

15

16                A P P E A R A N C E S

17

18   For the Government:

19        George J. Hazel, Esquire
          Steven H. Levin, Esquire
20

21   For the Defendant:

22        Deborah L. Boardman, Esquire
          Franklin W. Draper, Esquire
23

24

25   Gail A. Simpkins, RPR
     Official Court Reporter

1              P R O C E E D I N G S

2          THE COURT:  Call the case.  Mr. Hazel.

3          MR. HAZEL:  Yes, Your Honor.  Calling the case

4     of United States versus David W. Shanton, Sr.,

5     Criminal Number CCB-08-0142, George Hazel for the

6     government, along with Steve Levin, and Case Agent

7     Christopher Umlauf.

8           THE COURT:  All right.  Thank you.

9          MS. BOARDMAN:  Good morning, Your Honor, Deborah

10    Boardman, Assistant Federal Public Defender, and with

11    me is Frank Draper from my office, and David Shanton.

12         THE COURT:  Okay.  We had a brief call

13    yesterday.  I understand we may or may not be able to

14    address all the issues today, but there are some

15    pretrial motions that appear ready to be argued, and

16    perhaps hear some testimony.

17          I guess to the extent there might be testimony,

18    I'll turn to the government.  Perhaps it would make

19    sense to, unless there is anything preliminary, to get

20    the testimony on the record?

21         MR. HAZEL:  Your Honor, there are a couple

22    things I just want to correct from my written filing

23    before we do that.

24         THE COURT:  All right.

25         MR. HAZEL:  On one point I wasn't precise, where

1    I state that the only things that were recovered from

2    the defendant was the gun and handcuffs.

3         What happened was, that's all that was recovered

4    from him at the scene.  He was actually put into the

5    squad car still wearing the mask and still wearing the

6    gloves, the gloves and the mask were then recovered

7    back at the station.  So I would assume that that

8    would be also part of the motion to suppress, and so I

9    did want to clarify that.

10        THE COURT:  Okay.

11        MR. HAZEL:  Sort of going along with that, in

12   terms of how many witnesses we will need today,

13   because the defendant had on his mask at the scene,

14   Officer Filges, who is the officer who I was going to

15   call, the officer who made the arrest on the scene

16   actually never saw his face.  So he would not be able

17   to ID him.  He wouldn't be able to testify to the

18   recovery of the mask and the gloves.

19        I have another officer here who can testify to

20   those things.  That's all they would testify to,

21   though, so I don't know if it's something that can be

22   stipulated to or something that the Court could accept

23   by proffer just so we only have one witness instead of

24   a second witness that would just be very brief.

25        THE COURT:  My understanding of really the only

4

1    issue on the suppression of tangible evidence is

2    whether there was reasonable suspicion and/or probable

3    cause for, I guess it would have been Officer

4    Filges --

5          MR. HAZEL:  Yes.

6          THE COURT:  -- to stop Mr. Shanton and take him

7    into custody.

8          Unless there's going to be a dispute, I suppose,

9    that Mr. Shanton wasn't the person that was stopped,

10   taken into custody by the officer, I don't know that

11   we'll need to get testimony on that.  But perhaps you

12   all can --

13         Why don't we go ahead with Officer Filges and

14   see where we get.

15         MR. HAZEL:  Very well.  The government calls

16   Officer Mitch Filges for the record.

17         THE COURT:  Okay.

18         THE CLERK:  Please remain standing and raise

19   your right hand.

20                      MITCHELL FILGES

21   a witness called on behalf of the Government, having

22   been previously duly sworn, was examined and testified

23   as follows:

24         THE CLERK:  Thank you.  You may be seated.

25         Please speak directly into the microphone.

1    Would you state your name and spell your name for the

2    record?

3         THE WITNESS:  Officer Mitchell Filges, F I L G E S,

4    Hagerstown City Police.

5         THE CLERK:  Thank you.

6                   DIRECT EXAMINATION

7    BY MR. HAZEL:

8    Q    Good afternoon, officer, or good morning, I

9    should say.

10   A    Good morning.

11   Q    You stated that you are an officer.  Where are

12   you employed as an officer?

13   A    The Hagerstown City Police, Maryland, sir.

14   Q    And how long have you been employed there?

15   A    A year and a half.

16   Q    Prior to that, what were you doing?

17   A    I was a police officer in a borough outside of

18   the City of Pittsburgh, Pennsylvania.

19   Q    For how long?

20   A    A year.

21   Q    So in the two and a half years that you have as

22   an officer, approximately, and I don't need a specific

23   number, but approximately how many arrests would you

24   say you have made?

25   A    Around 100.

6

1    Q      Now I would like to turn your attention, if I

2    may, to the morning hours of November 24, 2007.  Were

3    you on duty approximately 8 o'clock that morning?

4    A      Yes, sir, I was.

5    Q      Did you have an opportunity to respond on that

6    morning to the Susquehanna Bank at 1326 Salem Avenue,

7    Hagerstown, Maryland?

8    A      Yes, sir.

9    Q      And why did you respond to that location at that

10   time?

11   A      We received a call of a holdup alarm coming from

12   the bank.

13   Q      Now I am going to show you, or at least attempt

14   to show you a diagram.  Do you recognize what I am

15   showing you?  I will mark it for identification as

16   Government's Exhibit 1.

17          Do you recognize what I am showing you on your

18   screen?

19          (Government's Motion Exhibit Number 1 was marked

20   for identification.)

21   A      Yes, sir.

22   Q      What do you recognize that as?

23   A      It's a map of the area that we are talking

24   about, the day in question.  It's Susquehanna Bank.

25   Q      Now do you actually see the Susquehanna Bank on

7

1    that map?

2    A      Yes, sir, an aerial view of it.

3    Q      Can you just try to describe where on the map,

4     as best you can, where on the may --

5           THE COURT:  Just point.  If you would touch

6     actually on the screen with your finger.

7    A      Ah.  Thank you, yes.

8    Q      Very impressive.  So that's the Susquehanna

9     Bank?

10   A      Yes, sir.

11   Q      Very good.  Now what did you see when you

12    arrived on the scene?

13   A      When I arrived on the scene, I saw two black

14    males running from -- I saw the door open and them

15    actually running out of the bank.

16   Q      If you could show us where on the map or where

17    on the picture of the bank you saw them running out

18    of?

19   A      It's going to be a south, south door right

20    there.

21   Q      For record, the witness has identified a

22    portion.  I guess it was sort of the bottom left of

23    the Susquehanna Bank; is that correct?

24   A      Yes.

25   Q      Looking at it as it appears on the map I mean.

8

```
1    A       The bottom left, yes, sir.

2    Q       So you said you actually saw them come out of

3     the bank; is that correct?

4    A       Yes, sir.

5    Q       Where were you at that point when you saw them

6     come out of the bank?

7    A       I was approximately just prior to Rhode Island

8     Avenue on Salem Avenue.

9    Q       Could you indicate on the map?

10   A       Approximately right there.

11   Q       So I guess -- and that's what you said, corner

12    of Rhode Island and Salem Avenue?

13   A       Yes, sir.

14   Q       When you saw them coming out of the bank, could

15    you see their faces?

16   A       No, sir.

17   Q       Why not?

18   A       The one had a mask on and the other one had his

19    back towards me.

20   Q       What happened at that point?

21   A       At that point, I was halfway out of my car.  I

22    stepped out of my car, identified myself as a police

23    officer and ordered them to stop, and they continued

24    to run southbound across Salem Avenue.

25   Q       Were you in uniform at that time?
```

9

1    A      Yes, sir.

2    Q      Were you driving a marked or an unmarked car?

3    A      It was a marked police car.

4    Q      So you said they ran in which direction?

5    A      Southbound, across Salem Avenue.

6    Q      You're indicating that on the map?

7    A      Yes, sir.

8    Q      What did you do at that point?

9    A      I reentered my vehicle, my marked police

10   cruiser, and took off following them.  They ran

11   southbound.  I drove up over a curb.

12   Q      Now can you indicate -- and where did they run

13   at that point?

14   A      At that point, they were still southbound,

15   running through this patch of grass right here, and I

16   followed in my cruiser.

17   Q      And so you drove your car up onto the grass?

18   A      Yes, sir.

19   Q      How did that turn out?

20   A      It was a little wet that morning, so I lost

21   control.

22   Q      What happened?

23   A      The back end of my cruiser hit a fence and

24   caused me to be facing westbound.

25   Q      And so what did you do at that point?

1    A      At that point I got out of my cruiser and

2     began -- continued following them southbound on foot

3     or, yeah, southbound on foot.

4    Q      Were they still running in the same general

5     direction, sort of down Delaware Lane there?

6    A      Yes, sir, through there.

7    Q      What is that?  Do you see right underneath where

8     you put the line there's sort of a white line there,

9     or what looks like on the screen a white line?  What

10    is that?

11   A      It's actually a fence surrounding the ball field

12    there.

13   Q      So that's the fence that you had referred to?

14   A      Yes, sir.

15   Q      And so you continued to chase at that point?

16   A      Yes, sir, on foot.

17   Q      At some point -- well, what happened next?

18   A      They continued to run.  If you can move the map

19    up.

20   Q      In this direction?

21   A      Yes, sir.

22          Is there any way to clear the marks or just get

23    around them?  Thank you.

24          They continued to run southbound on Delaware

25    Lane, and there's fence right here that you could

1      either go around on the, like lower portion, and

2      that's what they did.  They ran down and then --

3      Q      Did you follow them using the same path?

4      A      Yes, sir.  Then this address right here is, I

5      believe it's 1310 Delaware Lane.

6      Q      What is that?

7      A      It's just a residence.  They ran through the

8      backyard or through the side yard on the side of the

9      house, westbound.  Yeah, it would be westbound,

10     through the backyard.

11     Q      What were you doing at that time?

12     A      Following in foot pursuit.  I identified myself,

13     yelling at them, giving them verbal commands to stop

14     running.

15     Q      Are they both still together at this point?

16     A      At this point, yes.

17     Q      What happened next?

18     A      At this point, we crested the hill,

19     approximately right there.  The one gentleman wearing,

20     he was wearing a brown jacket, he stopped, and the

21     other gentleman wearing a black coat, he continued to

22     run.

23     Q      Did you stay with the gentleman who stopped or

24     the gentleman that continued to run?

25     A      The one that stopped.  I took control of him.

12

1    Q     And what happened at that point?

2    A     I drew down my service weapon and ordered an

3    oral command to see his hands, to keep his hands where

4    I could see them.

5    Q     At this point, did anybody go after the other

6    individual?

7    A     At this point, Officer Spiegler of the

8    Hagerstown City Police Department followed the other

9    subject that was running.

10   Q     So once you had the individual who you stopped,

11   stopped at gunpoint, what happened next?

12   A     He had his back towards me.  I continued to give

13   verbal commands, your hands, your hands, let me see

14   your hands.  He, at that point he did.  He put both

15   hands up and slowly turned his head back towards me,

16   keeping his body facing away from me.

17   Q     What did he do next, if anything?

18   A     At that point, still with verbal commands, he

19   lowered his right arm down to his waist area, and

20   slowly pulled out a black in color handgun.

21   Q     Now can you, if you wouldn't mind, if you could

22   stand and just sort of demonstrate for us what the

23   defendant did?

24         MR. HAZEL:  If I may approach, Your Honor?

25         THE COURT:  Sure.

13

1   Q     If I'm you, in what direction is the individual

2    facing?

3   A     The body is facing this direction and he's

4    looking over his shoulder like this, with both hands

5    in the air.

6   Q     You mentioned to me your shoulder is a little

7    hurt, so I don't want you to lift it to high.

8   A     Yes, sir.

9   Q     So demonstrate to me what you were describing.

10  A     He's looking back like this, slowly goes,

11   reaches down, pulls out a black in color gun, and

12   starts going till about there.

13  Q     Did you do anything at that point?

14  A     At that time I'm still screaming your hands,

15   your hands, drop the gun, drop the gun, toss it on the

16   ground, do it now, and at that time he dropped it.

17  Q     What happened at that point?

18  A     At that point I continued to keep him, for

19   officer safety issues, I kept him at gunpoint for

20   secondary weapon, and I went over and secured the gun

21   that he had tossed.

22  Q     Did the gun ever leave your sight?

23  A     No, sir.

24  Q     How did you secure the gun?

25  A     I placed it in the rear of my back, in between

14

1    my duty belt and my back.

2    Q      Approximately how long was it before you

3     received other police assistance?

4    A      No more than five minutes.

5    Q      What happened once those officers arrived?

6    A      Once those officers arrived, they placed him

7     into custody, and at that point I realized that he was

8     wearing a mask and a nylon stocking and like latex

9     gloves.

10   Q      When you said the nylon stocking, describe that.

11    I mean was he wearing it as a mask?  Is that what

12    you're --

13   A      I was like a pair of panty hose that he pulled

14    over his face.

15   Q      So could you see his facial features?

16   A      Very distorted.

17   Q      Did you see if anyone searched him at that time?

18   A      At that time the officer, Officer Leeney arrived

19    on the scene, and he did search him.

20   Q      What did he recover?

21   A      He located a set of handcuffs in his back pocket

22    and handcuff keys, and other miscellaneous items.

23   Q      What happened to the defendant at that point?

24   A      At that point, he was released to Officer

25    Anderson, who transported him to the Hagerstown Police

15

```
1    Department.
2            MR. HAZEL:  Court's indulgence.
3            No further questions of this witness.
4            THE COURT:  Thank you.  Ms. Boardman, do you
5     have any questions?
6            MR. HAZEL:  Your Honor, I'm sorry.  I do have
7     one more question.  I apologize.
8            THE COURT:  Okay.
9     BY MR. HAZEL:
10   Q     You said that this happened early morning.  Do
11    you remember around what time this happened?
12   A     Personally, 8 o'clock.
13   Q     Do you know what time the bank opens?
14   A     8:30.
15           MR. HAZEL:  No further questions.
16                   CROSS-EXAMINATION
17    BY MS. BOARDMAN:
18   Q     Good morning, Officer Filges.
19   A     Good morning.
20   Q     I'm Deborah Boardman.  I represent David
21    Shanton.
22   A     Good morning.
23   Q     Were you on patrol the morning of November 24,
24    2007?
25   A     Yes, ma'am.
```

16

```
 1   Q       What time did you get on duty that day?

 2   A       7 a.m., ma'am.

 3   Q       You received a call on the radio about a bank

 4    robbery at Susquehanna Bank; is that correct?

 5   A       There was a holdup alarm coming from Susquehanna

 6    Bank.

 7   Q       Where were you when you heard that alarm?

 8   A       I was within the city limits.

 9   Q       Approximately how far were you away from the

10    bank?

11   A       Two, three minutes.

12   Q       Was anyone with you?

13   A       Officer Spigler followed me.

14   Q       In a separate car?

15   A       Yes, ma'am.

16   Q       Both with marked patrol cars?

17   A       Yes, ma'am.

18   Q       Did the holdup alarm give any description of the

19    bank robbers?

20   A       No, ma'am.

21   Q       Describe for me what a holdup alarm is.

22   A       It's an alarm that bank tellers press whenever

23    they're in danger, they need help, a silent alarm.

24   Q       How do you, as an officer, get notice of it?

25   A       The alarm company contacts our dispatch.
```

17

```
 1    Q      Did you approach the bank on Rhode Island

 2     Avenue?

 3    A      No, ma'am.

 4    Q      How did you approach the bank?

 5    A      Off Salem.

 6    Q      You were heading northbound on Salem?

 7    A      Westbound on Salem, ma'am.

 8    Q      Westbound on Salem.

 9           So according to the screen, that would be from

10     the bottom up to the northwest corner?

11    A      Yes, ma'am.

12    Q      When you first -- let me back up.  You testified

13     that you saw two black males leave the bank; is that

14     correct?

15    A      That is what I testified to.

16    Q      Is that correct?

17    A      I saw two subjects running from the bank.

18    Q      You're not sure of their race?

19    A      At that point in time, they were two subjects in

20     dark color clothing.

21    Q      So at the time you first saw the individuals,

22     you did not know what race they were; is that correct?

23    A      That is correct.

24    Q      Where were you when you saw these two

25     individuals leave the bank?
```

PROSECUTION OF THE CITIZENS

18

1    A      I was getting out of my patrol car.

2    Q      Where on the map, if you could show me?

3    A      On the corner of Salem and Rhode Island.

4    Q      Were you in the middle of the intersection?

5    A      I was parked just past Salem Avenue.  I was

6     pulling in at Salem and Rhode Island, ma'am.

7    Q      You were pulling into the bank parking lot there

8     on the corner?

9    A      No.

10   Q      I don't want to put words in your mouth.  I want

11    to know exactly where you were when you first saw --

12   A      Exactly, I saw him in the middle of Salem

13    Avenue.

14   Q      Were you driving your car at that time?

15   A      Yes, ma'am.

16   Q      The car was moving?

17   A      No, ma'am.

18   Q      Why was the car stopped?

19   A      Because I saw two subjects running out of the

20    bank.

21   Q      What I'm trying to understand is you're driving

22    down the road, and then you saw the suspects, and then

23    you stopped the car?

24   A      Yeah.  Yes.

25   Q      Did you actually see them exit the bank?

PROSCUTATION OF MITCHELL

19

1    A        Yes.

2    Q        Did you see the door come open?

3    A        Yes.

4    Q        You didn't see either of their faces, correct?

5    A        That is correct.

6    Q        And you never saw the face of the second

7     suspect, correct?

8    A        That is correct.

9    Q        What did you --

10            THE COURT:  I'm sorry.  Just so I'm clear,

11    meaning the man in the black coat that kept on

12    running?

13            THE WITNESS:  Yes, the subject in the black

14    coat.

15            MS. BOARDMAN:  That's correct.  Thank you, Your

16    Honor.

17    BY MS. BOARDMAN:

18    Q        What was the subject in the black coat wearing

19     other than the black coat when you saw him?

20    A        He had a mask on.

21    Q        What kind of mask?

22    A        Like a ski mask.

23    Q        What color?

24    A        Black.

25    Q        Could you see any part of his face?

20

```
1    A      Never.

2    Q      What was he wearing on his lower body?

3    A      Dark color pants.

4    Q      Is there anything significant about what he was

5     wearing other than what you have told me?

6    A      That subject, no.

7    Q      What do you recall that the second subject was

8     wearing when you first saw him?

9    A      When I first saw him, I observed him wearing a

10    brown jacket and dark color pants.

11           THE COURT:  Just to be clear, the second subject

12    now is not the same as the second subject related to

13    the face.  If we can just distinguish between the

14    gentleman in the black coat and the gentleman in the

15    brown jacket, I think that will be fine.

16           MS. BOARDMAN:  Let me rephrase the question.

17    Thank you, Your Honor.

18    BY MS. BOARDMAN:

19    Q      What was the gentleman in the brown coat wearing

20    other than the brown coat?

21    A      He had a mask and latex gloves on, but I did

22    not, I didn't find out until later on.  When he came

23    running out of the bank, all I say was just the brown

24    jacket.

25    Q      Anything else?
```

21

```
1    A      No, ma'am.
2    Q      You said there came a time when you got in your
3     car to chase the two individuals across Salem Avenue,
4     correct?
5    A      Yes, ma'am.
6    Q      At what point in time did you get in your car in
7     relation to where they were?
8    A      They would have been approximately right there.
9    Q      So they were across Salem Avenue, heading
10    towards the baseball field?
11   A      Yes, ma'am.
12   Q      And you got in your car and you chased them?
13   A      Yes, ma'am.
14   Q      Did you keep your eyes on them the entire time?
15   A      The entire time, ma'am.
16   Q      Did you look for cars?
17   A      I never lost sight of them.
18   Q      Did you look for cars?
19   A      No, no.
20   Q      You say you crossed the street without looking
21    for cars, and you went up on the curb?
22   A      Yes, ma'am.
23   Q      As this is happening, are you keeping your eyes
24    on the defendants?
25   A      Yes, ma'am.
```

22

1    Q        I'm sorry.  The two individuals?

2    A        Yes.

3    Q        Then your car hits the fence, correct?

4    A        In the back end of it, yes.

5    Q        Please point out again where you were facing

6     when the car hit the fence.

7    A        I was approximately right there.  I was facing

8     southbound.  The rear end of my cruiser lost control

9     due to the wetness of the grass, and it spun me facing

10    westbound, facing that direction.

11   Q        Okay.  So you're facing across, as if you were

12    looking across Delaware Avenue?

13   A        Yes.

14   Q        At this point, do you know where the individuals

15    that you are chasing are?

16   A        Yes.  They are there.

17   Q        You have a clear line of sight there?

18   A        Yes.

19   Q        There's no obstruction?

20   A        There's no obstruction.

21   Q        The fence isn't obstructing your view?

22   A        No, ma'am.

23   Q        Where at this point, when your car hits the

24    fence, is Officer Spigler?

25   A        He -- if you can pull your map up, the other

23

```
1    way, ma'am.  Keep going.
2         He comes around the field and comes down this
3    way, and then here, and then drives in there, drives
4    down Delaware Lane.
5    Q    So when you got in your car and you went towards
6    the baseball field and hit the fence, he wasn't
7    following you?
8    A    No, ma'am.
9    Q    When your car crashed in the fence, you got out
10   and started chasing the individuals on foot?
11   A    Yes, ma'am.
12   Q    And what were you saying?
13   A    Police, freeze.
14   Q    At that point in time, did you know where
15   Officer Spigler was?
16   A    Yes.
17   Q    How did you know?
18   A    Peripheral vision, saw his cruiser.
19   Q    Coming up Delaware Lane?
20   A    Yes, ma'am.
21   Q    Then you testified that you went into the
22   backyard of the house at 1310, 1310 Delaware Avenue,
23   correct?
24   A    Yes, ma'am.
25   Q    You were chasing these two individuals?
```

24

```
1    A       Yes, ma'am.

2    Q       As that's happening, where is Officer Spigler?

3    A       He is coming around the house.  He comes through

4     here, and he ran off this side of the house, and then

5     around it.

6    Q       Just so the record is clear, Officer Spigler is

7     essentially running around the other side of the house

8     opposite from where you are --

9    A       Approximately.

10   Q       -- and where the suspects are?

11   A       Approximately two houses down, yes, ma'am.

12   Q       At some point you say that the defendant

13    responded to your order to freeze and stop, correct?

14   A       Yes, ma'am.

15   Q       At that point, where is the second suspect?

16   A       He is running.

17           THE COURT:  Can you go back to the black jacket,

18    brown?

19           MS. BOARDMAN:  Yes, we absolutely can.

20   Q       At some point the gentleman in the brown jacket

21    responded to your calls to freeze?

22   A       Right.

23   Q       And he did freeze?

24   A       Right.

25   Q       Where did the suspect in the black jacket go?
```

25

1   A       The gentleman in the brown jacket is the yellow

2    mark that I did, and the gentleman in the black jacket

3    continued running in that direction.

4   Q       For the record, you identified that the

5    individual in the brown jacket was in the backyard of

6    the house at 1310 Delaware Avenue, and that the

7    individual in the brown jacket ran towards, back

8    towards Salem Avenue?

9   A       Back towards Salem, yes, ma'am.

10          THE COURT:  The black jacket ran back towards

11   Salem?

12   Q       Yes.  The individual in the black jacket ran

13   towards Salem Avenue?

14   A       Yes, ma'am.

15   Q       When the individual in the brown jacket stopped,

16   where was Officer Spigler?

17   A       He ran past.  At that time he was approximately

18   right there.

19   Q       Could you see him?

20   A       At the time that the suspect in the brown jacket

21   stopped, yes.

22   Q       How far away from the suspect was Officer

23   Spigler at the time?

24   A       I don't recall.

25   Q       More than 20 feet?

26

```
1            MR. HAZEL:  Objection.  He already said he

2    doesn't recall.

3            THE COURT:  Sustained.

4    BY MS. BOARDMAN:

5    Q      Was he in the backyard?

6    A      Yes, ma'am.

7    Q      What did Officer Spigler do when the individual

8    in the brown jacket froze?

9    A      He turned around and asked if I was okay.

10   Q      What did you say?

11   A      I said yes, I am, go, go, and he continued on

12   foot chasing the other subject.

13   Q      So at that point it's just you and the

14   individual in the brown jacket in the backyard,

15   correct?

16   A      Yes, ma'am.

17   Q      At what point in time did the individual in the

18   brown jacket -- and from this point on, I'll refer to

19   him as the suspect, since he is the only suspect at

20   issue at this point.

21   A      Okay.

22   Q      At what point in time did the suspect start to

23   remove the gun from his waistband?  How long after he

24   stopped did he remove the gun from his waistband?

25   A      No more than five minutes.
```

27

1    Q      Was Officer Spigler present when the suspect

2     removed the gun from his waistband?

3    A      No, ma'am.

4    Q      So only you were present at that time?

5    A      Yes, ma'am.

6    Q      I'm going to walk through what happened when the

7     individual removed the gun from the waistband.  You

8     stated that he had his hands up like this?

9    A      Yes, ma'am.

10   Q      And his back was to you?

11   A      Yes, ma'am.

12   Q      In your mind, did you believe he had surrendered?

13   A      No, ma'am.

14   Q      Why not?

15   A      Can you define surrender?

16   Q      Did you believe that he had responded to your

17    command to freeze and stopped fleeing from you?

18   A      Yes, ma'am.

19   Q      So his hands are in the air, and what happens

20    next?

21   A      He lowers his right arm.

22   Q      Please go ahead.

23   A      He lowered his right arm in a reaching motion

24    towards his waist.

25   Q      With what speed?  Was it fast, slow, abrupt?

1    How you would characterize it?

2          (Pause.)

3    A     I can't answer that question.

4    Q     Is there something I could say that could

5    clarify it for you?  I'm not --

6    A     No, just everything happened very quickly.  It

7    felt like time slowed down when this happened.  So it

8    could have been a very fast reach.  It could have been

9    a very slow reach.  I'm not sure of that answer,

10   ma'am.

11   Q     Before the suspect started reaching for his

12   waistband, were you aware as to whether he was

13   carrying a gun or not?

14   A     No, ma'am.  We had gotten reports while we were,

15   after we were in the pursuit.

16         We saw them running from the bank.  Dispatch

17   advised that both males -- that's when we learned they

18   were both black males, both armed with handguns.

19         So at that time I did know that he should have a

20   weapon on him, unless he left it in the bank.

21   Q     But you didn't know for sure?

22   A     No, ma'am.

23   Q     When you saw him reaching for the gun in his

24   waistband, what was your reaction?

25   A     It was a shoot/don't shoot scenario.

29

1    Q        Explain that for me.  What does that mean?

2    A        Officer safety.  If at that point in time, he

3     was not facing towards me, that's a don't shoot

4     scenario.

5            He was reaching for something, so I had just

6     cause for what I was doing.  If at anytime, you know,

7     he made a movement to endanger me, put me in danger,

8     then yes, it would be a shoot scenario.

9    Q        As he pulled the gun out of his waistband, did

10    you fear for your life?

11   A        Yes.

12   Q        Did he threaten you with the gun?

13   A        He turned towards me with the gun still in hand.

14   Q        Was the gun pointing towards you?

15   A        It was pointing outwards.

16   Q        Where was the gun pointing?

17   A        Outwards.

18   Q        Can you explain for me what outwards means.  Was

19    it in your direction?  Was it outwards towards his

20    right?

21   A        It was towards his right.

22   Q        So it was not pointed at you?

23   A        But he was still, you know, making movements.

24    He was still turning his body towards me.

25   Q        How was he holding the gun?

30

1   A      With the grip.

2   Q      He was gripping the gun?

3   A      Yes, ma'am.

4          MR. HAZEL:  Your Honor, I'm going to object to

5    this as it's irrelevant to this hearing.

6          THE COURT:  I do think we are getting into a bit

7    more detail than we probably need.

8          MS. BOARDMAN:  I can wrap it up, Your Honor.

9          THE COURT:  Okay.

10   By MS. BOARDMAN:

11  Q      You ordered him to drop the gun?

12  A      Yes, ma'am.

13  Q      And did he do so?

14  A      After several times of telling him, yes.

15  Q      About how far away from him did the gun land

16   when he dropped it?

17  A      Approximately ten feet.

18  Q      To your knowledge, did anyone else witness what

19   happened the moments before the defendant pulled the

20   gun out of his waistband and the moments afterwards

21   other than you?

22  A      Officers or anybody?

23  Q      Officers.

24  A      No, ma'am.  I was the only one.

25  Q      At any point in time during this course of

31

```
 1        events did the defendant, I'm sorry, did the suspect
 2        in the brown jacket ever say anything to you?
 3    A        No, ma'am.
 4             MS. BOARDMAN:  Court's indulgence.
 5             THE COURT:  Uh-huh.
 6             (Pause.)
 7    Q        Just a few follow-up questions.  We talked a bit
 8        about where Officer Spigler was when the suspect in
 9        the brown jacket froze.
10    A        Yes.
11    Q        When he asked you, Officer Spigler asked you
12        whether you were okay, was the suspect standing up?
13    A        Yes.
14    Q        He was not on the ground?
15    A        No, ma'am.
16    Q        At some point the suspect was on the ground,
17        correct?
18    A        Yes, ma'am.
19    Q        That occurred after Officer Spigler had left the
20        area?
21    A        Yes, ma'am.
22    Q        He got on the ground at your direction?
23    A        Yes, ma'am.
24             MS. BOARDMAN:  No further questions.  Thank you.
25             THE COURT:  Any redirect, Mr. Hazel?
```

1          MR. HAZEL:  No, Your Honor.

2          THE COURT:  Thank you very much, sir.  You are

3     excused.

4          Ms. Boardman, I guess the question is whether

5     you want to dispute that Mr. Shanton was the

6     individual who was stopped and was wearing the mask

7     and withdrew the gun from his waistband or was taken

8     into custody after being stopped by Officer Filges.

9          (Pause.)

10         MR. HAZEL:  Just to be clear, we certainly

11    wouldn't be suggesting that the defense stipulate to

12    it for purposes of trial, just for the purposes of --

13         THE COURT:  Sure, just for purposes of arguing

14    on the suppress motion.

15         MS. BOARDMAN:  Yeah.  On the search issue, we

16    are not contesting it.  We are not conceding that

17    fact, but we are not conceding that it was Mr. Shanton

18    who had the mask and gloves.

19         THE COURT:  Okay.  For purposes of this hearing,

20    you are not going to contest the government's proffer

21    that the gentleman in the brown jacket that we've just

22    been hearing about that was taken into custody and

23    from whom later handcuffs and keys and the nylon mask

24    and the latex gloves were taken was Mr. Shanton.  Just

25    for purposes of this hearing, you're not contesting

33

1      that.

2              MS. BOARDMAN:  Right.  Thank you.

3              THE COURT:  The government has proffered that,

4      and I don't hear anything to contest it.

5              All right.  Ms. Boardman, do you want to be

6      heard on the motion to suppress the tangible evidence,

7      which I guess is the gun, the handcuffs, the keys, the

8      masks, and the latex gloves?

9              MS. BOARDMAN:  Your Honor, we have no argument.

10     Thank you.

11             THE COURT:  Okay.  I think it's obvious from the

12     unchallenged evidence that has been presented today

13     that the officer had at least reasonable suspicion, if

14     not probable cause, to stop the individual that turned

15     out to be Mr. Shanton.  In the course of that,

16     obviously discovering the gun and the fact that Mr.

17     Shanton was in the mask, and combining that with the

18     alarm information from the bank, he certainly had

19     reason to believe that this was one of the individuals

20     that had just robbed the bank.

21             So that the immediate stop and search, in the

22     course of which, or incident, during which the gun was

23     recovered did not violate Mr. Shanton's Fourth

24     Amendment rights, nor did the arrest and the later

25     retrieval of the mask and the gloves.  So I would deny

34

1          the motion to suppress tangible evidence.

2              There was also a motion to suppress Mr.

3      Shanton's statement to a government agent.  I gather,

4      other than the most recently filed question or motion

5      about statements that may have been made to a non-law

6      enforcement agent, there really isn't any issue here.

7      There are no statements made to law agents that you're

8      planning to introduce?

9              MR. HAZEL:  Again, just to be precise, the only

10     statement that the defendant ever makes is he does

11     finally say that he is David Shanton at some point at

12     the station, which is just part of the booking

13     process.  But beyond that, no, Your Honor.

14             THE COURT:  Okay.  So you might, if it's an

15     issue, seek to introduce his statement that he was

16     David Shanton made as part of the booking process, but

17     no other statement?

18             MR. HAZEL:  I don't know that I will, but it's

19     certainly possible, and I think it's allowed under the

20     case law.

21             THE COURT:  Okay.  It wouldn't seem to me that

22     requires any evidentiary hearing at this point.  If

23     you think there's some issue when we get to it --

24             MS. BOARDMAN:  Your Honor, based on what we have

25     before us and what we know now, we don't think there's

1    an issue with that.

2         THE COURT:  Okay.  What I will do is I will

3    probably deny that motion as moot, but that's without

4    prejudice to your raising it again if you think there

5    is an issue.

6         MS. BOARDMAN:  Okay.  Thank you.

7         THE COURT:  There is also a severance motion,

8    which I'll be happy to hear any additional argument

9    on.

10        I guess my preliminary question, it doesn't go

11   directly to this issue, but I'm just going to ask the

12   government why on earth we have eight counts in an

13   indictment coming out of two bank robberies?  Am I

14   missing something?

15        It appears to me that Count 1 relates to, only

16   to the events of October 22, 2007.  I guess Count 5

17   relates only to the events of November 24, 2007.  I

18   can't see for the life of me why there's a 371

19   conspiracy charge as opposed to simply the bank

20   robbery, with, you know, an aiding and abetting.

21        MR. HAZEL:  Your Honor is asking why we charged

22   both conspiracy and the actual offense?

23        THE COURT:  Yes.

24        MR. HAZEL:  It would be my understanding that

25   that's appropriate.  If Your Honor is of a different

```
1     view --
2          THE COURT:  I am strongly of a different view,
3     unless there is some good reason for it.  Quite
4     frankly, I don't see that you need it.  I don't see it
5     adds anything, and it just confuses the heck out of
6     the jury, because then I have to give them conspiracy
7     instructions.
8          So I would just ask you to think about that
9     between now and trial.  Unless there is some good
10    reason that is not evident to me, I really don't see
11    the need of having those conspiracy charges in there.
12         MR. HAZEL:  We'll take a look at that, Your
13    Honor.
14         THE COURT:  Okay.  On the other, the severance
15    as to the sets of counts relating to the October 22nd
16    robbery and those that relate to the November bank
17    robbery, would you like to be heard, Ms. Boardman?
18         MS. BOARDMAN:  Yes, Your Honor.  Thank you.
19         Your Honor, we filed a motion to sever the
20    counts relating to the two separate bank robberies.
21    One occurred on October 24, 2007 and one on
22    November -- I'm sorry, October 22, 2007 and the other
23    on November 24, 2007.
24         There are two relevant inquiries before the
25    Court.  The first is whether these counts relating to
```

37

1       the two separate bank robberies were properly joined

2       under Rule 8, and the second is whether in fact they

3       were joined, whether joinder of the two would so

4       prejudice the defendant that the Court should order

5       separate trials.

6           I'll start with whether joinder is appropriate

7       under Rule 8, and I submit to the Court that it is

8       not.  In fact, the government in its opposition only

9       responds to this issue in passing and with a case

10      that's not instructive and actually not on point, but

11      I'll deal with that in a moment.

12          Under Rule 8, the joinder of offenses is

13      appropriate if they are of the same or similar

14      character, are based on the same act or transaction,

15      or are connected with or constitute part of a common

16      scheme or plan.

17          I think here the only question is whether these

18      bank robberies are of the same or similar character.

19      They are not based on the same act or transaction.

20      They occurred over a month apart, at different banks,

21      and they are not connected with, and do not constitute

22      part of a common scheme or plan.

23          So whether or not these bank robberies share

24      similar characteristics enough such that they should

25      be tried together is the question.  In the facts

38

1    proffered by the government in the government's

2    opposition, and some of those gleaned from discovery,

3    I think, I think that the two robberies are actually

4    distinctly different and should not be joined, and

5    here is why, Your Honor.

6         The October bank robbery was an actual robbery

7    in which money was taken.  The November bank robbery

8    was an attempt.  No money was taken.

9         The times on which these bank robberies occurred

10   were completely different.  The October bank robbery

11   occurred during the week, in the mid-afternoon.  The

12   November bank robbery occurred on a Saturday, around 8

13   o'clock in the morning.  Indeed, it was again an

14   attempt, not even a bank robbery, and that occurred

15   before the bank was open.

16        The actions of the robbers in the October bank

17   robbery are significantly different than the alleged

18   actions of the attempted bank robbers for the November

19   bank robbery.

20        For instance, the October bank robbery, the bank

21   robbers apparently threatened the employee with a

22   shotgun.  The bank robbers, when they fled with the

23   money, when approached by a police officer, ordered

24   the police officer to drop his gun, and then shot at

25   the police officer.  That alleged activity is

39

1        completely different than what happened in the

2        November bank robbery, where there does not appear to

3        be an actual threat of an employee with a shotgun.

4             The activities of the bank robbers after the

5        attempted robbery in November were totally different.

6        They fled on foot.  When approached by a police

7        officer, one ran, one surrendered.  Although one was

8        apparently armed, at least one was armed, there was no

9        shooting at the police officer, no aggression.

10            So when courts have considered whether to join

11       bank robberies -- and we'll admit that the presumption

12       is towards joinder.  That's not the issue.  But the

13       issue is whether or not joinder is appropriate and

14       then whether there's prejudice.

15            I found two cases which admittedly the Courts

16       found that joinder was appropriate, but those cases

17       are different than the case we have here.  I have an

18       unpublished Fourth Circuit case and also a published

19       opinion.

20            The published is United States against Acker, 52

21       F.3d 509.  In that case, all of the robberies involved

22       involved a black female, which is fairly unique,

23       apparently acting alone, and dressed in basically the

24       same disguise each time of the robbery, that contrast

25       with the two different types of robberies we have

1    here.

2         THE COURT:  What is the evidence regarding how

3    many individuals were involved in the first and how

4    many in the second?

5         MS. BOARDMAN:  Two and two.  It's not

6    surprising, Your Honor.  You have seen many more bank

7    robberies than I have, but I think many banks

8    robberies occur with two people.  I think that a

9    singular black female, apparently, allegedly robbing

10   four banks is much more unique than two individuals

11   robbing two separate banks, in very different manners,

12   a month apart.

13        Another case that's unreported, and I can

14   summarize the facts there in which the Court found

15   that joinder was appropriate, this is United States

16   against Smith, 122 F.3d 1064.

17        There, the two robberies were only two days

18   apart.  They both occurred in the same area.  The

19   robber was similarly dressed each time, wearing heavy

20   clothing, a hat or a hood.  In both robberies, the

21   robber wielded a black semiautomatic pistol.

22        On each occasion the witness described the

23   getaway car, which matched the characteristics of one

24   of the two vehicles belonging to the wife of the

25   defendant.  So given those similarities, the Court

41

1    found that joinder was appropriate.

2         THE COURT:  Let me just get to what is to me the

3    crucial question, Ms. Boardman.  Is there any dispute

4    that -- well, is it clear that the government is at

5    least going to present evidence that the gun retrieved

6    from I believe Mr. Shanton in the second bank robbery

7    is the gun taken from an officer in the first bank

8    robbery?  Have I got that right?

9         MS. BOARDMAN:  It appears that that is the case,

10   and that is --

11        THE COURT:  Then really what are we talking?

12   Once you start with that, why isn't that in itself

13   enough to tell me that you've got -- the evidence of

14   one would come into the other.  That would certainly

15   be relevant evidence for the government to introduce I

16   guess to prove however you want it.

17        The fact that Mr. Shanton has the gun that was

18   taken from the officer in the first bank robbery, that

19   he has that gun within less than a month in the course

20   of allegedly committing another bank robbery certainly

21   makes it more likely, certainly would be relevant

22   evidence that he committed the first bank robbery.

23   Wouldn't it?

24        MS. BOARDMAN:  Well, I think there are a number

25   of responses to that.  I think that the only alleged

1        overlapping piece of evidence would be the gun.  So

2        then the first question is whether in fact the gun or

3        the fact that the gun was obtained or was from the

4        officer in the first bank robbery, whether that

5        evidence can come in in the second bank robbery.  I

6        believe the only way -- I don't know how it's relevant

7        to the second bake robbery per se.

8             THE COURT:  I was saying to the first bank

9        robbery.  The fact that he had the gun less than a

10       month after the first bank robbery was committed, that

11       that gun was taken at the time of the first bank

12       robbery, he is now within less than a month in

13       possession of a gun taken during the first bank

14       robbery.  Doesn't that make it more likely that he

15       committed the first bank robbery?

16            MS. BOARDMAN:  I would imagine the only way that

17       it could come in would be under Rule 404(b).  I mean

18       we would certainly challenge that.

19            There's no direct evidence that he in fact

20       committed the first bank robbery, and there's no

21       evidence connecting him to the gun, as to exactly how

22       that gun was obtained.  There was a month when that

23       gun was missing, and there's no evidence as to what

24       happened to the gun in the meantime.

25            But even if Your Honor were to admit the fact

1     that Mr. Shanton was found with this gun in November,

2     and the bank robbery in the first, in the trial for

3     the first bank robbery, it doesn't necessarily mean

4     the Court has to hear both cases together.  I think

5     the Court still needs to consider whether or not

6     joinder was appropriate.  I don't think that the gun

7     makes joinder necessarily appropriate or satisfies

8     Rule 8.

9          The government relies on Cardwell to support its

10    claim that because the gun seems to connect the two,

11    that the Court should find joinder appropriate, but

12    that case wasn't a bank robbery case.  It was a

13    murder-for-hire case.  The Court considered whether to

14    join the counts on the murder-for-hire and the gun

15    count, and they found that they should because when

16    the officers approached the defendant and said we're

17    arresting you for murder-for-hire, he responded by

18    saying oh, well, if I had known you were coming, I

19    would have gotten my gun so that I would have gone

20    down fighting rather than go to jail.

21         The Fourth Circuit later found that based on

22    that, the charges were properly joined as part of the

23    "same transaction under Rule 8."

24         Here, we don't have the same transaction issue.

25    The issue here is whether the counts are the same or

44

1      similar character.  For the reasons I've described

2      earlier, I don't believe that they are.

3          So the commonality of this one piece of evidence

4      between these two charges I don't think supports Rule

5      8 joinder.  I actually think it would prejudice the

6      defendant, which is exactly what Rule 14 addresses.

7          If I could just talk a bit about Rule 14 and the

8      prejudice, and I'll just note that the government

9      didn't even address this issue in its opposition.

10          Joinder is appropriate where --

11          Well, joinder in this case is appropriate

12      because it will prevent the jury, after they hear

13      evidence of two separate bank robberies, with this

14      connecting piece of evidence in the gun, allegedly

15      connecting, but certainly gives rise to an inference

16      that they are connected.  That will prevent the jury

17      from making a reliable judgment about guilt or

18      innocence for each bank robbery.

19          Your Honor, I fear here, and I think it's well

20      founded, that if the jury hears evidence of the

21      October bank robbery and the November bank robbery,

22      and despite the differences in the bank robberies,

23      that they are going to convict on both or one or the

24      other based on accumulation of the evidence.

25          I think that this is a classic case for

45

1    severance.  If there was no gun, I think that these

2    bank robberies would never have been tried together,

3    or shouldn't have been tried together.

4         Your Honor, that's all I have for the Court.  I

5    would just ask you to consider -- I understand the

6    Court has discretion under Rule 14 -- just to consider

7    the basis for Rule 8 and the resulting prejudice that

8    would occur.  Thank you.

9         THE COURT:  Thank you.

10        Mr. Hazel.

11        MR. HAZEL:  Your Honor, I don't really have much

12   to add other than what the Court has said and what is

13   in the government's papers.  If Your Honor has

14   questions for the government, I'm certainly happy to

15   address those.  Otherwise, we would just submit on

16   what has already been said.

17        THE COURT:  Again, am I correct that there is

18   going to be evidence proffered that the gun I just

19   heard about being taken out of, for these purposes,

20   Mr. Shanton's waistband is a gun that was taken,

21   stolen in the course of the earlier October 22nd

22   robbery?

23        MR. HAZEL:  Your Honor is absolutely correct in

24   that.  Of course, as we argued, and as Your Honor has

25   already suggested, we feel strongly that establishes

46

1    the logical connection between these two bank

2    robberies.

3         THE COURT:  Okay.  Well, Ms. Boardman, as

4    always, is arguing valiantly, but I think with a very

5    uphill battle on this issue given the fact of the gun.

6         First of all, I think joinder is appropriate

7    under Rule 8.  They are of the same or similar

8    character.  We're talking about two armed bank

9    robberies committed in Hagerstown within a month of

10   each other.  And while I agree it's not as unusual as

11   a single female, there are two men involved.  They are

12   both armed robberies.

13        I don't see that the fact that one was

14   successful in obtaining money and one was not would

15   preclude joinder under Rule 8.

16        I think it's a fairly common sense test.  So I

17   think the joinder was appropriate to begin with, and

18   under Rule 14, I don't think there is a --

19        Well, severance is not to be granted unless

20   there's a serious risk that this joint trial would

21   prevent the jury from reaching a reliable verdict.

22   The point here is that there is evidence I think the

23   jury would be entitled to hear that is quite

24   probative.

25        Whether these two had been joined in the same

47

1     indictment or not, that connection of the gun, as we

2     have just discussed, is certainly probative on the

3     question of Mr. Shanton's involvement in the first

4     bank robbery.  So the circumstances of the second bank

5     robbery, which he is apparently seen fleeing from the

6     bank, would come in in any event to show his

7     possession of the recently stolen gun.

8          I certainly accept Ms. Boardman's point that

9     there could very well be other explanations as to how

10    he came into possession of that gun.  I'm not saying

11    it's the only explanation, or even it's the one the

12    jury would accept, but it is certainly a reasonable

13    and logical inference that could be drawn from his

14    possession of that stolen gun, and I think it is one

15    that entitles the government to try these two bank

16    robberies together, and to do so would not be in

17    violation of either Rule 8 or Rule 14.

18         So I will deny the motion to sever the sets of

19    counts involving each bank robbery from each other.

20         Okay.  Any other pending motion that is ready to

21    address?

22         MS. BOARDMAN:  No, Your Honor, thank you.

23         MR. HAZEL:  Another motion has been filed by

24    counsel.  We just received it a few days ago, so I

25    have not had an opportunity to respond to that.

48

1          THE COURT:  Let's see.  Do we have another date

2     scheduled at this point, or do we need to schedule

3     briefing on the outstanding motion and then perhaps

4     schedule another conference call?  Is that where we

5     are?

6          MS. BOARDMAN:  Yes, Your Honor.  That makes

7     sense.

8          THE COURT:  What would be your response date to

9     the new motion to suppress?

10          MR. HAZEL:  Ms. Boardman and I had actually

11     agreed on July 18th.  So that's fine.

12          THE COURT:  All right.  Ms. Boardman, you wanted

13     to reply to that by the 25th of July?

14          MS. BOARDMAN:  That's correct, Your Honor.

15     Thank you.

16          THE COURT:  Okay.  I will ask Ms. Tyson if she

17     will look at my calendar for the week of August 4th

18     and see if there is 15 minutes anywhere in the morning

19     or the late afternoon?

20          While she is looking, the other dates -- well,

21     we have the trial set to begin October 20th.  All

22     right.  We need a date for pretrial conference.  So we

23     could set that during the conference call.

24          THE CLERK:  The week of August 14th?

25          THE COURT:  No, 4th.  I'm just looking for

49

1      something at 9 or 9:15 in the morning, just 15 minutes

2      or 5 o'clock or 5:15.

3            MR. HAZEL:  Your Honor, I was just going to

4      mention, Mr. Levin and I are actually in a trial the

5      week of August 4th.  So we would just ask that it

6      would either be first thing in the morning or after we

7      would be back.

8            THE COURT:  So 9 o'clock or 5:15, something like

9      that?

10           THE CLERK:  That Friday, August the 8th.

11           THE COURT:  9 o'clock.

12           THE CLERK:  You have do not schedule anything at

13     nine.  You have a sentencing at 9:15.

14           THE COURT:  9 o'clock is fine then.  August 8th,

15     9 a.m.  Mr. Hazel, if you would initiate the call?

16           MR. HAZEL:  Very well, Your Honor.

17           THE COURT:  Okay.  Anything else that we can

18     discuss right now?

19           MR. LEVIN:  Your Honor, if I may, I have been

20     trying to recall why we charged it this way.  I just

21     want to point out, Mr. Hazel, I don't know was even in

22     the office at the time, so he shouldn't be blame for

23     my decision.

24           But I will say that I think the government

25     displayed considerable restraint by not charging

50

1      kidnapping, which was something we could have charged,

2      but we opted to charge the conspiracy and mention it

3      in the overt act, the kidnapping.

4           So that factored into our decision to charge

5      these two conspiracies, which involved two different

6      people, one of whom we anticipate will cooperate and

7      testify at trial.  So that all factored in.

8           I certainly understand the Court's point.  I

9      just wanted to mention that we did show some restraint

10     by not charging everything we could have.

11          THE COURT:  Just almost everything.  I

12     appreciate that.  I still think you might take a look

13     at whether you really need those in order to admit

14     evidence, if that was your point, to get in evidence

15     about what he may or may not have done while he was

16     allegedly eluding law enforcement officers.  It seems

17     to me that would be part of your evidence, whether

18     it's mentioned as an overt act or not.

19          MR. LEVIN:  And I'm certainly not disputing with

20     the Court.  We'll consider that.

21          THE COURT:  Okay.

22          MR. LEVIN:  I just wanted to bring that to your

23     attention.

24          THE COURT:  All right.  Thank you.

25          Anything else?

51

1          MS. BOARDMAN:  No.  Thank you, Your Honor.

2          THE COURT:  Okay.  I'll talk to you August 8th

3     at 9 a.m.  Thank you.

4          MR. HAZEL:  Have a good afternoon, Your Honor.

5          (The proceedings concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX

 2     GOVERNMENT'S WITNESS                    PAGE

 3     MITCHELL FILGES

 4     By Mr. Hazel:                           5

 5     By Ms. Boardman:                        15

 6     GOVERNMENT'S MOTION EXHIBITS    MARKED   REC'D

 7     1                               6

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

53

1                    REPORTER'S CERTIFICATE

2        I hereby certify that the foregoing transcript in

3   the matter of United States of America vs. David W.

4   Shanton, Sr., Defendant, Criminal Action No.

5   CCB-08-0142, before the Honorable Catherine C. Blake,

6   United States District Judge, on July 9, 2008 is true

7   and accurate.

8

9                  _____

10                     Gail A. Simpkins

11                   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## 1

**1** [4] - 6:16, 6:19, 35:15, 52:7
**100** [1] - 5:25
**1064** [2] - 40:16
**122** [1] - 40:16
**1310** [4] - 11:5, 23:22, 25:6
**1326** [1] - 6:6
**14** [5] - 44:6, 44:7, 45:6, 46:18, 47:1
**14th** [1] - 48:24
**15** [3] - 48:18, 49:1, 52:5
**18th** [1] - 48:11

## 2

**20** [1] - 25:25
**2007** [7] - 6:2, 15:24, 35:16, 35:17, 36:21, 36:22, 36:23
**2008** [2] - 1:9, 53:6
**20th** [1] - 48:21
**22** [2] - 35:16, 36:22
**22nd** [2] - 36:15, 45:21
**24** [5] - 6:2, 15:23, 35:17, 36:21, 36:23
**25th** [1] - 48:13

## 3

**371** [1] - 35:18

## 4

**404(b)** [1] - 42:17
**4th** [3] - 48:17, 48:25, 49:5

## 5

**5** [3] - 35:16, 49:2, 52:4
**509** [1] - 39:21
**52** [1] - 39:20
**5:15** [2] - 49:2, 49:8

## 6

**6** [1] - 52:7

## 7

**7** [1] - 16:2

## 8

**8** [13] - 6:3, 15:12, 37:2, 37:7, 37:12, 38:12, 43:8, 43:23, 44:5, 45:7, 46:7, 46:15, 47:17
**8:30** [1] - 15:14
**8th** [3] - 49:10, 49:14, 51:2

## 9

**9** [8] - 1:9, 49:1, 49:8, 49:11, 49:14, 49:15, 51:3, 53:6
**9:15** [2] - 49:1, 49:13

## A

**a.m** [3] - 16:2, 49:15, 51:3
**abetting** [1] - 35:20
**able** [3] - 2:13, 3:16, 3:17
**above-entitled** [1] - 1:12
**abrupt** [1] - 27:25
**absolutely** [2] - 24:19, 45:23
**accept** [3] - 3:22, 47:8, 47:12
**according** [1] - 17:9
**accumulation** [1] - 44:24
**accurate** [1] - 53:7
**Acker** [1] - 39:20
**act** [4] - 37:14, 37:19, 50:3, 50:18
**acting** [1] - 39:23
**Action** [1] - 53:4
**actions** [2] - 38:16, 38:18
**activities** [1] - 39:4
**activity** [1] - 38:25
**actual** [1] - 35:22, 38:6, 39:3
**add** [1] - 45:12
**additional** [1] - 35:8
**address** [5] - 2:14, 11:4, 44:9, 45:15, 47:21
**addresses** [1] - 44:6

**adds** [1] - 36:5
**admit** [3] - 39:11, 42:25, 50:13
**admittedly** [1] - 39:15
**advised** [1] - 28:17
**aerial** [1] - 7:2
**afternoon** [4] - 5:8, 38:11, 48:19, 51:4
**afterwards** [1] - 30:20
**agent** [2] - 34:3, 34:6
**Agent** [1] - 2:6
**agents** [1] - 34:7
**aggression** [1] - 39:9
**ago** [1] - 47:24
**agree** [1] - 46:10
**agreed** [1] - 48:11
**ahead** [2] - 4:13, 27:22
**aiding** [1] - 35:20
**air** [2] - 13:5, 27:19
**alarm** [9] - 6:11, 16:5, 16:7, 16:18, 16:21, 16:22, 16:23, 16:25, 33:18
**alleged** [3] - 38:17, 38:25, 41:25
**allegedly** [4] - 40:9, 41:20, 44:14, 50:16
**allowed** [1] - 34:19
**almost** [1] - 50:11
**alone** [1] - 39:23
**Amendment** [1] - 33:24
**America** [1] - 53:3
**AMERICA** [1] - 1:4
**Anderson** [2] - 28:3, 28:9
**anticipate** [1] - 50:6
**anytime** [1] - 29:6
**apart** [3] - 37:20, 40:12, 40:18
**apologize** [1] - 15:7
**appear** [2] - 2:15, 39:2
**appreciate** [1] - 50:12
**approach** [3] - 12:24, 17:1, 17:4
**approached** [3] - 38:23, 39:6, 43:16
**appropriate** [14] - 35:25, 37:6, 37:13, 39:13, 39:16, 40:15, 41:1, 43:6, 43:7, 43:11, 44:10, 44:11, 46:6, 46:17
**area** [4] - 6:23,

12:19, 31:20, 40:18
**argued** [2] - 2:15, 45:24
**arguing** [2] - 32:13, 46:4
**argument** [2] - 33:9, 35:8
**arm** [2] - 12:19, 27:21, 27:23
**armed** [5] - 28:18, 39:8, 46:8, 46:12
**arrest** [2] - 3:15, 33:24
**arresting** [1] - 43:17
**arrests** [1] - 5:23
**arrived** [5] - 7:12, 7:13, 14:5, 14:6, 14:18
**assistance** [1] - 14:3
**Assistant** [1] - 2:10
**assume** [1] - 3:7
**attempt** [3] - 6:13, 38:8, 38:14
**attempted** [2] - 38:18, 39:5
**attention** [2] - 6:1, 50:23
**August** [5] - 48:17, 48:24, 49:5, 49:10, 49:14, 51:2
**Avenue** [16] - 6:6, 8:8, 8:12, 8:24, 9:5, 17:2, 18:5, 18:13, 21:3, 21:9, 22:12, 23:22, 25:6, 25:8, 25:13
**aware** [1] - 28:12

## B

**backyard** [6] - 11:8, 11:10, 23:22, 25:5, 26:5, 26:14
**bake** [1] - 42:7
**ball** [1] - 10:11
**Baltimore** [1] - 1:8
**Bank** [7] - 6:6, 6:24, 6:25, 7:9, 7:23, 16:4, 16:6
**bank** [77] - 6:12, 7:15, 7:17, 8:3, 8:6, 8:14, 15:13, 16:3, 16:10, 16:19, 16:22, 17:1, 17:4, 17:13, 17:17, 17:25, 18:7, 18:20, 18:25, 20:23, 28:16, 28:20, 33:18, 33:20, 35:13, 35:19, 36:16, 36:20, 37:1,

37:18, 37:23, 38:6, 38:7, 38:9, 38:10, 38:12, 38:14, 38:15, 38:16, 38:18, 38:19, 38:20, 38:22, 39:2, 39:4, 39:11, 40:6, 41:6, 41:7, 41:18, 41:20, 41:22, 42:4, 42:5, 42:8, 42:10, 42:11, 42:13, 42:15, 42:20, 43:2, 43:3, 43:12, 44:13, 44:18, 44:22, 44:22, 45:2, 46:1, 46:8, 47:4, 47:6, 47:15, 47:19
**banks** [4] - 37:20, 40:7, 40:10, 40:11
**baseball** [2] - 21:10, 23:6
**based** [5] - 34:24, 37:14, 37:19, 43:21, 44:24
**basis** [1] - 45:7
**battle** [1] - 46:5
**began** [1] - 10:2
**begin** [2] - 46:17, 48:21
**behalf** [1] - 4:21
**belonging** [1] - 40:24
**belt** [1] - 14:1
**best** [1] - 7:4
**between** [5] - 13:25, 20:13, 36:9, 44:4, 46:1
**beyond** [1] - 34:13
**bit** [3] - 30:6, 31:7, 44:7
**Black** [1] - 19:24
**black** [19] - 7:13, 11:21, 12:20, 13:11, 17:13, 19:11, 19:13, 19:18, 19:19, 20:14, 24:17, 24:25, 25:2, 25:10, 25:12, 28:18, 39:22, 40:9, 40:21
**Blake** [2] - 1:13, 53:5
**blame** [1] - 49:22
**Boardman** [9] - 1:22, 2:10, 15:4, 15:20, 32:4, 33:5, 36:17, 41:3, 46:3, 48:10, 48:12, 52:5
**BOARDMAN** [26] - 2:9, 15:17, 19:15, 19:17, 20:16, 20:18, 24:19, 26:4, 30:8, 30:10, 31:4, 31:24, 32:15, 33:2, 33:9, 34:24, 35:6, 36:18, 40:5, 41:9, 41:24,

42:16, 47:22, 48:6, 48:14, 51:1
**Boardman's** [1] - 47:8
**body** [4] - 12:16, 13:3, 20:2, 29:24
**booking** [2] - 34:12, 34:16
**borough** [1] - 5:17
**bottom** [3] - 7:22, 8:1, 17:10
**brief** [2] - 2:12, 3:24
**briefing** [1] - 48:3
**bring** [1] - 50:22
**brown** [19] - 11:20, 20:10, 20:15, 20:19, 20:20, 20:23, 24:18, 24:20, 25:1, 25:5, 25:7, 25:15, 25:20, 26:8, 26:14, 26:18, 31:2, 31:9, 32:21
**BY** [6] - 5:7, 15:9, 15:17, 19:17, 20:18, 26:4

**C**

**calendar** [1] - 48:17
**car** [21] - 3:5, 8:21, 8:22, 9:2, 9:3, 9:17, 16:14, 18:1, 18:14, 18:16, 18:18, 18:23, 21:3, 21:6, 21:12, 22:3, 22:6, 22:23, 23:5, 23:9, 40:23
**Cardwell** [1] - 43:9
**carrying** [1] - 28:13
**cars** [4] - 16:16, 21:16, 21:18, 21:21
**case** [15] - 1:12, 2:2, 2:3, 34:20, 37:9, 39:17, 39:18, 39:21, 40:13, 41:9, 43:12, 43:13, 44:11, 44:25
**Case** [1] - 2:6
**cases** [3] - 39:15, 39:16, 43:4
**Catherine** [2] - 1:13, 53:5
**caused** [1] - 9:24
**CCB-08-0142** [3] - 1:5, 2:5, 53:5
**certainly** [14] - 32:10, 33:18, 34:19, 41:14, 41:20, 41:21, 42:18, 44:15, 45:14, 47:2, 47:8, 47:12, 50:8, 50:19
**CERTIFICATE** [1] -

53:1
**certify** [1] - 53:2
**challenge** [1] - 42:18
**character** [4] - 37:14, 37:18, 44:1, 46:8
**characteristics** [2] - 37:24, 40:23
**characterize** [1] - 28:1
**charge** [3] - 35:19, 50:2, 50:4
**charged** [3] - 35:21, 49:20, 50:1
**charges** [3] - 36:11, 43:22, 44:4
**charging** [2] - 49:25, 50:10
**chase** [2] - 10:15, 21:3
**chased** [1] - 21:12
**chasing** [4] - 22:15, 23:10, 23:25, 26:12
**Christopher** [1] - 2:7
**Circuit** [2] - 39:18, 43:21
**circumstances** [1] - 47:4
**City** [4] - 5:4, 5:13, 5:18, 12:8
**city** [1] - 16:8
**claim** [1] - 43:10
**clarify** [2] - 3:9, 28:5
**classic** [1] - 44:25
**clear** [7] - 10:22, 19:10, 20:11, 22:17, 24:6, 32:10, 41:4
**CLERK** [6] - 4:18, 4:24, 5:5, 48:24, 49:10, 49:12
**clothing** [2] - 17:20, 40:20
**coat** [8] - 11:21, 19:11, 19:14, 19:18, 19:19, 20:14, 20:19, 20:20
**color** [6] - 12:20, 13:11, 17:20, 19:23, 20:3, 20:10
**combining** [1] - 33:17
**coming** [6] - 6:11, 8:14, 16:5, 24:3, 35:13, 43:18
**Coming** [1] - 23:19
**command** [2] - 12:3, 27:17
**commands** [3] - 11:13, 12:13, 12:18
**committed** [5] - 41:22, 42:10, 42:15,

42:20, 46:9
**committing** [1] - 41:20
**common** [3] - 37:15, 37:22, 46:16
**commonality** [1] - 44:3
**company** [1] - 16:25
**completely** [2] - 38:10, 39:1
**conceding** [2] - 32:16, 32:17
**concluded** [1] - 51:5
**conference** [1] - 48:4, 48:22, 48:23
**confuses** [1] - 36:5
**connect** [1] - 43:10
**connected** [3] - 37:15, 37:21, 44:16
**connecting** [3] - 42:21, 44:14, 44:15
**connection** [2] - 46:1, 47:1
**consider** [4] - 43:5, 45:5, 45:6, 50:20
**considerable** [1] - 49:25
**considered** [2] - 39:10, 43:13
**conspiracies** [1] - 50:5
**conspiracy** [5] - 35:19, 35:22, 36:6, 36:11, 50:2
**constitute** [2] - 37:15, 37:21
**contacts** [1] - 16:25
**contest** [2] - 32:20, 33:4
**contesting** [2] - 32:16, 32:25
**continued** [11] - 8:23, 10:2, 10:15, 10:18, 10:24, 11:21, 11:24, 12:12, 13:18, 25:3, 26:11
**contrast** [1] - 39:24
**control** [3] - 9:21, 11:25, 22:8
**convict** [1] - 44:23
**cooperate** [1] - 50:6
**corner** [4] - 8:11, 17:10, 18:3, 18:8
**correct** [22] - 2:22, 7:23, 8:3, 16:4, 17:14, 17:16, 17:22, 17:23, 19:4, 19:5, 19:7, 19:8, 19:15, 21:4, 22:3, 23:23, 24:13, 26:15, 31:17, 45:17, 45:23,

48:14
**counsel** [1] - 47:24
**count** [1] - 43:15
**Count** [2] - 35:15, 35:16
**counts** [7] - 35:12, 36:15, 36:20, 36:25, 43:14, 43:25, 47:19
**couple** [1] - 2:21
**course** [6] - 30:25, 33:15, 33:22, 41:19, 45:21, 45:24
**COURT** [54] - 1:1, 2:2, 2:8, 2:12, 2:24, 3:10, 3:25, 4:6, 4:17, 7:5, 12:25, 15:4, 15:8, 19:10, 20:11, 24:17, 25:10, 26:3, 30:6, 30:9, 31:5, 31:25, 32:2, 32:13, 32:19, 33:3, 33:11, 34:14, 34:21, 35:2, 35:7, 35:23, 36:2, 36:14, 40:2, 41:2, 41:11, 42:8, 45:9, 45:17, 46:3, 48:1, 48:8, 48:12, 48:16, 48:25, 49:8, 49:11, 49:14, 49:17, 50:11, 50:21, 50:24, 51:2
**Court** [16] - 1:25, 3:22, 36:25, 37:4, 37:7, 40:14, 40:25, 43:4, 43:5, 43:11, 43:13, 45:4, 45:6, 45:12, 50:20, 53:11
**Court's** [3] - 15:2, 31:4, 50:8
**courts** [1] - 39:10
**Courts** [1] - 39:15
**crashed** [1] - 23:9
**crested** [1] - 11:18
**CRIMINAL** [1] - 1:5
**Criminal** [2] - 2:5, 53:4
**CROSS** [1] - 15:16
**CROSS-EXAMINATION** [1] - 15:16
**crossed** [1] - 21:20
**crucial** [1] - 41:3
**cruiser** [6] - 9:10, 9:16, 9:23, 10:1, 22:8, 23:18
**curb** [2] - 9:11, 21:21
**custody** [5] - 4:7, 4:10, 14:7, 32:8, 32:22

**D**

**danger** [2] - 16:23, 29:7
**dark** [2] - 17:20, 20:10
**Dark** [1] - 20:3
**date** [3] - 48:1, 48:8, 48:22
**dates** [1] - 48:20
**DAVID** [1] - 1:6
**David** [6] - 2:4, 2:11, 15:20, 34:11, 34:16, 53:3
**days** [2] - 40:17, 47:24
**deal** [1] - 37:11
**Deborah** [3] - 1:22, 2:9, 15:20
**decision** [2] - 49:23, 50:4
**DEFENDANT** [1] - 1:7
**defendant** [12] - 3:2, 3:13, 12:23, 14:23, 24:12, 30:19, 31:1, 34:10, 37:4, 40:25, 43:16, 44:6
**Defendant** [2] - 1:21, 53:4
**defendants** [1] - 21:24
**Defender** [1] - 2:10
**defense** [1] - 32:11
**define** [1] - 27:15
**Delaware** [8] - 10:5, 10:24, 11:5, 22:12, 23:4, 23:19, 23:22, 25:6
**demonstrate** [2] - 12:22, 13:9
**deny** [3] - 33:25, 35:3, 47:18
**Department** [2] - 12:8, 15:1
**Describe** [1] - 16:21
**describe** [2] - 7:3, 14:10
**described** [2] - 40:22, 44:1
**describing** [1] - 13:9
**description** [1] - 16:18
**despite** [1] - 44:22
**detail** [1] - 30:7
**diagram** [1] - 6:14
**differences** [1] - 44:22
**different** [12] - 35:25,

36:2, 37:20, 38:4,
38:10, 38:17, 39:1,
39:5, 39:17, 39:25,
40:11, 50:5
  **direct** [1] - 42:19
  **DIRECT** [1] - 5:6
  **direction** [9] - 9:4,
10:5, 10:20, 13:1,
13:3, 22:10, 25:3,
29:19, 31:22
  **directly** [2] - 4:25,
35:11
  **discovering** [1] -
33:16
  **discovery** [1] - 38:2
  **discretion** [1] - 45:6
  **discuss** [1] - 49:18
  **discussed** [1] - 47:2
  **disguise** [1] - 39:24
  **Dispatch** [1] - 28:16
  **dispatch** [1] - 16:25
  **displayed** [1] - 49:25
  **dispute** [3] - 4:8,
32:5, 41:3
  **disputing** [1] - 50:19
  **distinctly** [1] - 38:4
  **distinguish** [1] -
20:13
  **distorted** [1] - 14:16
  **DISTRICT** [2] - 1:1,
1:2
  **District** [2] - 1:14,
53:6
  **done** [1] - 50:15
  **door** [3] - 7:14, 7:19,
19:2
  **down** [11] - 10:5,
11:2, 12:2, 12:19,
13:11, 18:22, 23:2,
23:4, 24:11, 28:7,
43:20
  **Draper** [2] - 1:22,
2:11
  **drawn** [1] - 47:13
  **dressed** [2] - 39:23,
40:19
  **drew** [1] - 12:2
  **drives** [2] - 23:3
  **driving** [3] - 9:2,
18:14, 18:21
  **drop** [4] - 13:15,
30:11, 38:24
  **dropped** [2] - 13:16,
30:16
  **drove** [2] - 9:11, 9:17
  **due** [1] - 22:9
  **duly** [1] - 4:22
  **during** [5] - 30:25,
33:22, 38:11, 42:13,
48:23

  **duty** [3] - 6:3, 14:1,
16:1

# E

  **early** [1] - 15:10
  **earth** [1] - 35:12
  **eight** [1] - 35:12
  **either** [4] - 11:1,
19:4, 47:17, 49:6
  **eluding** [1] - 50:16
  **employed** [2] - 5:12,
5:14
  **employee** [2] -
38:21, 39:3
  **end** [3] - 9:23, 22:4,
22:8
  **endanger** [1] - 29:7
  **enforcement** [2] -
34:6, 50:16
  **entire** [2] - 21:14,
21:15
  **entitled** [2] - 1:12,
46:23
  **entitles** [1] - 47:15
  **Esquire** [4] - 1:19,
1:19, 1:22, 1:22
  **essentially** [1] - 24:7
  **establishes** [1] -
45:25
  **event** [1] - 47:6
  **events** [2] - 31:1,
35:16, 35:17
  **evidence** [24] - 4:1,
33:6, 33:12, 34:1,
40:2, 41:5, 41:13,
41:15, 41:22, 42:1,
42:5, 42:19, 42:21,
42:23, 44:3, 44:13,
44:14, 44:20, 44:24,
45:18, 46:22, 50:14,
50:17
  **evident** [1] - 36:10
  **evidentiary** [1] -
34:22
  **exactly** [3] - 18:11,
42:21, 44:6
  **Exactly** [1] - 18:12
  **EXAMINATION** [2] -
5:6, 15:16
  **examined** [1] - 4:22
  **excused** [1] - 32:3
  **Exhibit** [2] - 6:16,
6:19
  **EXHIBITS** [1] - 52:6
  **exit** [1] - 18:25
  **Explain** [1] - 29:1
  **explain** [1] - 29:18
  **explanation** [1] -

47:11
  **explanations** [1] -
47:9
  **extent** [1] - 2:17
  **eyes** [2] - 21:14,
21:23

# F

  **F.3d** [2] - 39:21,
40:16
  **face** [5] - 3:16, 14:14,
19:6, 19:25, 20:13
  **faces** [2] - 8:15, 19:4
  **facial** [1] - 14:15
  **facing** [10] - 9:24,
12:16, 13:2, 13:3,
22:5, 22:7, 22:9,
22:10, 22:11, 29:3
  **fact** [12] - 32:17,
33:16, 37:2, 37:8,
41:17, 42:2, 42:3,
42:9, 42:19, 42:25,
46:5, 46:13
  **factored** [2] - 50:4,
50:7
  **facts** [2] - 37:25,
40:14
  **fairly** [2] - 39:22,
46:16
  **far** [3] - 16:9, 25:22,
30:15
  **fast** [2] - 27:25, 28:8
  **fear** [2] - 29:10,
44:19
  **features** [1] - 14:15
  **Federal** [1] - 2:10
  **feet** [2] - 25:25,
30:17
  **felt** [1] - 28:7
  **female** [3] - 39:22,
40:9, 46:11
  **fence** [10] - 9:23,
10:11, 10:13, 10:25,
22:3, 22:6, 22:21,
22:24, 23:6, 23:9
  **few** [2] - 31:7, 47:24
  **field** [4] - 10:11,
21:10, 23:2, 23:6
  **fighting** [1] - 43:20
  **filed** [3] - 34:4,
36:19, 47:23
  **Filges** [7] - 3:14, 4:4,
4:13, 4:16, 5:3, 15:18,
32:8
  **FILGES** [2] - 4:20,
52:3
  **filing** [1] - 2:22
  **finally** [1] - 34:11

  **fine** [3] - 20:15,
48:11, 49:14
  **finger** [1] - 7:6
  **First** [1] - 46:6
  **first** [22] - 17:12,
17:21, 18:11, 20:8,
20:9, 36:25, 40:3,
41:7, 41:18, 41:22,
42:2, 42:4, 42:8,
42:10, 42:11, 42:13,
42:15, 42:20, 43:2,
43:3, 47:3, 49:6
  **five** [2] - 14:4, 26:25
  **fled** [2] - 38:22, 39:6
  **fleeing** [2] - 27:17,
47:5
  **follow** [2] - 11:3,
31:7
  **follow-up** [1] - 31:7
  **followed** [3] - 9:16,
12:8, 16:13
  **Following** [1] - 11:12
  **following** [3] - 9:10,
10:2, 23:7
  **follows** [1] - 4:23
  **foot** [7] - 10:2, 10:3,
10:16, 11:12, 23:10,
26:12, 39:6
  **FOR** [1] - 1:2
  **foregoing** [1] - 53:2
  **founded** [1] - 44:20
  **four** [1] - 40:10
  **Fourth** [3] - 33:23,
39:18, 43:21
  **Frank** [1] - 2:11
  **Franklin** [1] - 1:22
  **frankly** [1] - 36:4
  **freeze** [5] - 23:13,
24:13, 24:21, 24:23,
27:17
  **Friday** [1] - 49:10
  **froze** [2] - 26:8, 31:9

# G

  **Gail** [2] - 1:25, 53:10
  **gather** [1] - 34:3
  **general** [1] - 10:4
  **gentleman** [1] -
11:19, 11:21, 11:23,
11:24, 20:14, 20:19,
24:20, 25:1, 25:2,
32:21
  **George** [2] - 1:19,
2:5
  **getaway** [1] - 40:23
  **given** [2] - 40:25,
46:5
  **gleaned** [1] - 38:2

  **gloves** [9] - 3:6,
3:18, 14:9, 20:21,
32:18, 32:24, 33:8,
33:25
  **Government** [2] -
1:18, 4:21
  **government** [15] -
2:6, 2:18, 4:15, 33:3,
34:3, 35:12, 37:8,
38:1, 41:4, 41:15,
43:9, 44:8, 45:14,
47:15, 49:24
  **Government's** [2] -
6:16, 6:19
  **GOVERNMENT'S** [2]
- 52:2, 52:6
  **government's** [3] -
32:20, 38:1, 45:13
  **granted** [1] - 46:19
  **grass** [3] - 9:15,
9:17, 22:9
  **grip** [1] - 30:1
  **gripping** [1] - 30:2
  **ground** [4] - 13:16,
31:14, 31:16, 31:22
  **guess** [9] - 2:17, 4:3,
7:22, 8:11, 32:4, 33:7,
35:10, 35:16, 41:16
  **guilt** [1] - 44:17
  **gun** [56] - 3:2, 13:11,
13:15, 13:20, 13:22,
13:24, 26:23, 26:24,
27:2, 27:7, 28:13,
28:23, 29:9, 29:12,
29:13, 29:14, 29:16,
29:25, 30:2, 30:11,
30:15, 30:20, 32:7,
33:7, 33:16, 33:22,
38:24, 41:5, 41:7,
41:17, 41:19, 42:1,
42:2, 42:3, 42:9,
42:11, 42:13, 42:21,
42:22, 42:23, 42:24,
43:1, 43:6, 43:10,
43:14, 43:19, 44:14,
45:1, 45:18, 45:20,
46:5, 47:1, 47:7,
47:10, 47:14
  **gunpoint** [2] - 12:11,
13:19

# H

  **Hagerstown** [6] -
5:4, 5:13, 6:7, 12:8,
14:25, 46:9
  **half** [2] - 5:15, 5:21
  **halfway** [1] - 8:21
  **hand** [2] - 4:19,

29:13
**handcuff** [1] - 14:22
**handcuffs** [4] - 3:2, 14:21, 32:23, 33:7
**handgun** [1] - 12:20
**handguns** [1] - 28:18
**hands** [11] - 12:3, 12:13, 12:14, 12:15, 13:4, 13:14, 13:15, 27:8, 27:19
**happy** [2] - 35:8, 45:14
**hat** [1] - 40:20
**Hazel** [8] - 1:19, 2:2, 2:5, 31:25, 45:10, 49:15, 49:21, 52:4
**HAZEL** [28] - 2:3, 2:21, 2:25, 3:11, 4:5, 4:15, 5:7, 12:24, 15:2, 15:6, 15:9, 15:15, 26:1, 30:4, 32:1, 32:10, 34:9, 34:18, 35:21, 35:24, 36:12, 45:11, 45:23, 47:23, 48:10, 49:3, 49:16, 51:4
**head** [1] - 12:15
**heading** [2] - 17:6, 21:9
**hear** [6] - 2:16, 33:4, 35:8, 43:4, 44:12, 46:23
**heard** [4] - 16:7, 33:6, 36:17, 45:19
**hearing** [6] - 1:13, 30:5, 32:19, 32:22, 32:25, 34:22
**hears** [1] - 44:20
**heavy** [1] - 40:19
**heck** [1] - 36:5
**help** [1] - 16:23
**hereby** [1] - 53:2
**high** [1] - 13:7
**hill** [1] - 11:18
**hire** [3] - 43:13, 43:14, 43:17
**hit** [3] - 9:23, 22:6, 23:6
**hits** [2] - 22:3, 22:23
**holding** [1] - 29:25
**holdup** [4] - 6:11, 16:5, 16:18, 16:21
**Honor** [35] - 2:3, 2:9, 2:21, 12:24, 15:6, 19:16, 20:17, 30:4, 30:8, 32:1, 33:9, 34:13, 34:24, 35:21, 35:25, 36:13, 36:18, 36:19, 38:5, 40:6, 42:25, 44:19, 45:4,

45:11, 45:13, 45:23, 45:24, 47:22, 48:6, 48:14, 49:3, 49:16, 49:19, 51:1, 51:4
**Honorable** [2] - 1:13, 53:5
**hood** [1] - 40:20
**hose** [1] - 14:13
**hours** [1] - 6:2
**house** [6] - 11:9, 23:22, 24:3, 24:4, 24:7, 25:6
**houses** [1] - 24:11
**hurt** [1] - 13:7

**I**

**ID** [1] - 3:17
**identification** [2] - 6:15, 6:20
**identified** [4] - 7:21, 8:22, 11:12, 25:4
**imagine** [1] - 42:16
**immediate** [1] - 33:21
**impressive** [1] - 7:8
**IN** [1] - 1:1
**incident** [1] - 33:22
**Indeed** [1] - 38:13
**INDEX** [1] - 52:1
**indicate** [2] - 8:9, 9:12
**indicating** [1] - 9:6
**indictment** [2] - 35:13, 47:1
**individual** [13] - 12:6, 12:10, 13:1, 25:5, 25:7, 25:12, 25:15, 26:7, 26:14, 26:17, 27:7, 32:6, 33:14
**individuals** [10] - 17:21, 17:25, 21:3, 22:1, 22:14, 23:10, 23:25, 33:19, 40:3, 40:10
**indulgence** [2] - 15:2, 31:4
**inference** [2] - 44:15, 47:13
**information** [1] - 33:18
**initiate** [1] - 49:15
**innocence** [1] - 44:18
**inquiries** [1] - 36:24
**instance** [1] - 38:20
**instead** [1] - 3:23
**instructions** [1] -

36:7
**instructive** [1] - 37:10
**intersection** [1] - 18:4
**introduce** [3] - 34:8, 34:15, 41:15
**involved** [5] - 39:21, 39:22, 40:3, 46:11, 50:5
**involvement** [1] - 47:3
**involving** [1] - 47:19
**irrelevant** [1] - 30:5
**Island** [5] - 8:7, 8:12, 17:1, 18:3, 18:6
**issue** [16] - 4:1, 26:20, 32:15, 34:6, 34:15, 34:23, 35:1, 35:5, 35:11, 37:9, 39:12, 39:13, 43:24, 43:25, 44:9, 46:5
**issues** [2] - 2:14, 13:19
**items** [1] - 14:22
**itself** [1] - 41:12

**J**

**jacket** [21] - 11:20, 20:10, 20:15, 20:24, 24:17, 24:20, 24:25, 25:1, 25:2, 25:5, 25:7, 25:10, 25:12, 25:15, 25:20, 26:8, 26:14, 26:18, 31:2, 31:9, 32:21
**jail** [1] - 43:20
**join** [2] - 39:10, 43:14
**joinder** [16] - 37:3, 37:6, 37:12, 39:12, 39:13, 39:16, 40:15, 41:1, 43:6, 43:7, 43:11, 44:5, 44:11, 46:6, 46:15, 46:17
**Joinder** [1] - 44:10
**joined** [5] - 37:1, 37:3, 38:4, 43:22, 46:25
**joint** [1] - 46:20
**Judge** [2] - 1:14, 53:6
**judgment** [1] - 44:17
**July** [4] - 1:9, 48:11, 48:13, 53:6
**jury** [7] - 36:6, 44:12, 44:16, 44:20, 46:21, 46:23, 47:12

**K**

**Keep** [1] - 23:1
**keep** [3] - 12:3, 13:18, 21:14
**keeping** [2] - 12:16, 21:23
**kept** [2] - 13:19, 19:11
**keys** [3] - 14:22, 32:23, 33:7
**kidnapping** [2] - 50:1, 50:3
**kind** [1] - 19:21
**knowledge** [1] - 30:18
**known** [1] - 43:18

**L**

**land** [1] - 30:15
**Lane** [5] - 10:5, 10:25, 11:5, 23:4, 23:19
**late** [1] - 48:19
**latex** [4] - 14:8, 20:21, 32:24, 33:8
**law** [4] - 34:5, 34:7, 34:20, 50:16
**learned** [1] - 28:17
**least** [6] - 6:13, 33:13, 39:8, 41:5
**leave** [3] - 13:22, 17:13, 17:25
**Leeney** [1] - 14:18
**left** [4] - 7:22, 8:1, 28:20, 31:19
**less** [3] - 41:19, 42:9, 42:12
**LEVIN** [3] - 49:19, 50:19, 50:22
**Levin** [3] - 1:19, 2:6, 49:4
**life** [2] - 29:10, 35:18
**lift** [1] - 13:7
**likely** [2] - 41:21, 42:14
**limits** [1] - 16:8
**line** [4] - 10:8, 10:9, 22:17
**located** [1] - 14:21
**location** [1] - 6:9
**logical** [2] - 46:1, 47:13
**look** [5] - 21:16, 21:18, 36:12, 48:17, 50:12
**looking** [6] - 13:4,

13:10, 21:20, 22:12, 48:20, 48:25
**Looking** [1] - 7:25
**looks** [1] - 10:9
**lost** [3] - 9:20, 21:17, 22:8
**lower** [2] - 11:1, 20:2
**lowered** [2] - 12:19, 27:23
**lowers** [1] - 27:21

**M**

**ma'am** [48] - 15:25, 16:2, 16:15, 16:17, 16:20, 17:3, 17:7, 17:11, 18:6, 18:15, 18:17, 21:1, 21:5, 21:11, 21:13, 21:15, 21:22, 21:25, 22:22, 23:1, 23:8, 23:11, 23:20, 23:24, 24:1, 24:11, 24:14, 25:9, 25:14, 26:6, 26:16, 27:3, 27:5, 27:9, 27:11, 27:13, 27:18, 28:10, 28:14, 28:22, 30:3, 30:12, 30:24, 31:3, 31:15, 31:18, 31:21, 31:23
**males** [4] - 7:14, 17:13, 28:17, 28:18
**man** [1] - 19:11
**manners** [1] - 40:11
**map** [10] - 6:23, 7:1, 7:3, 7:16, 7:25, 8:9, 9:6, 10:18, 18:2, 22:25
**mark** [2] - 6:15, 25:2
**MARKED** [1] - 52:6
**marked** [6] - 6:19, 9:2, 9:3, 9:9, 16:16
**marks** [1] - 10:22
**MARYLAND** [1] - 1:2
**Maryland** [3] - 1:8, 5:13, 6:7
**mask** [6] - 3:5, 3:6, 3:13, 3:18, 8:18, 14:8, 14:11, 19:20, 19:21, 19:22, 20:21, 32:6, 32:18, 32:23, 33:17, 33:25
**masks** [1] - 33:8
**matched** [1] - 40:23
**matter** [1] - 53:3
**mean** [5] - 7:25, 14:11, 29:1, 42:17, 43:3
**meaning** [1] - 19:11

**means** [1] - 29:18
**meantime** [1] - 42:24
**men** [1] - 46:11
**mention** [3] - 49:4, 50:2, 50:9
**mentioned** [2] - 13:6, 50:18
**microphone** [1] - 4:25
**mid** [1] - 38:11
**mid-afternoon** [1] - 38:11
**middle** [2] - 18:4, 18:12
**might** [3] - 2:17, 34:14, 50:12
**mind** [2] - 12:21, 27:12
**minutes** [5] - 14:4, 16:11, 26:25, 48:18, 49:1
**miscellaneous** [1] - 14:22
**missing** [2] - 35:14, 42:23
**Mitch** [1] - 4:16
**MITCHELL** [2] - 4:20, 52:3
**Mitchell** [1] - 5:3
**moment** [1] - 37:11
**moments** [2] - 30:19, 30:20
**money** [4] - 38:7, 38:8, 38:23, 46:14
**month** [7] - 37:20, 40:12, 41:19, 42:10, 42:12, 42:22, 46:9
**moot** [1] - 35:3
**morning** [16] - 2:9, 5:8, 5:10, 6:2, 6:3, 6:6, 9:20, 15:10, 15:18, 15:19, 15:22, 15:23, 38:13, 48:18, 49:1, 49:6
**most** [1] - 34:4
**MOTION** [1] - 52:6
**Motion** [1] - 6:19
**motion** [15] - 3:8, 27:23, 32:14, 33:6, 34:1, 34:2, 34:4, 35:3, 35:7, 36:19, 47:18, 47:20, 47:23, 48:3, 48:9
**motions** [2] - 1:12, 2:15
**mouth** [1] - 18:10
**move** [1] - 10:18
**movement** [1] - 29:7
**movements** [1] - 29:23

**moving** [1] - 18:16
**MR** [31] - 2:3, 2:21, 2:25, 3:11, 4:5, 4:15, 5:7, 12:24, 15:2, 15:6, 15:9, 15:15, 26:1, 30:4, 32:1, 32:10, 34:9, 34:18, 35:21, 35:24, 36:12, 45:11, 45:23, 47:23, 48:10, 49:3, 49:16, 49:19, 50:19, 50:22, 51:4
**MS** [26] - 2:9, 15:17, 19:15, 19:17, 20:16, 20:18, 24:19, 26:4, 30:8, 30:10, 31:4, 31:24, 32:15, 33:2, 33:9, 34:24, 35:6, 36:18, 40:5, 41:9, 41:24, 42:16, 47:22, 48:6, 48:14, 51:1
**murder** [3] - 43:13, 43:14, 43:17
**murder-for-hire** [3] - 43:13, 43:14, 43:17

## N

**name** [2] - 5:1
**necessarily** [2] - 43:3, 43:7
**need** [10] - 3:12, 4:11, 5:22, 16:23, 30:7, 36:4, 36:11, 48:2, 48:22, 50:13
**needs** [1] - 43:5
**never** [4] - 3:16, 19:6, 21:17, 45:2
**Never** [1] - 20:1
**new** [1] - 48:9
**next** [5] - 10:17, 11:17, 12:11, 12:17, 27:20
**nine** [1] - 49:13
**NO** [1] - 1:5
**non** [1] - 34:5
**non-law** [1] - 34:5
**northbound** [1] - 17:6
**northwest** [1] - 17:10
**note** [1] - 44:8
**notice** [1] - 16:24
**November** [13] - 6:2, 15:23, 35:17, 36:16, 36:22, 36:23, 38:7, 38:12, 38:18, 39:2, 39:5, 43:1, 44:21
**Number** [2] - 2:5, 6:19
**number** [2] - 5:23,

41:24
**nylon** [3] - 14:8, 14:10, 32:23

## O

**o'clock** [7] - 6:3, 15:12, 38:13, 49:2, 49:8, 49:11, 49:14
**object** [1] - 30:4
**Objection** [1] - 26:1
**observed** [1] - 20:9
**obstructing** [1] - 22:21
**obstruction** [2] - 22:19, 22:20
**obtained** [2] - 42:3, 42:22
**obtaining** [1] - 46:14
**obvious** [1] - 33:11
**obviously** [1] - 33:16
**occasion** [1] - 40:22
**occur** [2] - 40:8, 45:8
**occurred** [8] - 31:19, 36:21, 37:20, 38:9, 38:11, 38:12, 38:14, 40:18
**October** [11] - 35:16, 36:15, 36:21, 36:22, 38:6, 38:10, 38:16, 38:20, 44:21, 45:21, 48:21
**OF** [2] - 1:2, 1:4
**offense** [1] - 35:22
**offenses** [1] - 37:12
**office** [2] - 2:11, 49:22
**Officer** [23] - 3:14, 4:3, 4:13, 4:16, 5:3, 12:7, 14:18, 14:24, 15:18, 16:13, 22:24, 23:15, 24:2, 24:6, 25:16, 25:22, 26:7, 27:1, 29:2, 31:8, 31:11, 31:19, 32:8
**officer** [22] - 3:14, 3:15, 3:19, 4:10, 5:8, 5:11, 5:12, 5:17, 5:22, 8:23, 13:19, 14:18, 16:24, 33:13, 38:23, 38:24, 38:25, 39:7, 39:9, 41:7, 41:18, 42:4
**officers** [4] - 14:5, 14:6, 43:16, 50:16
**Officers** [1] - 30:22, 30:23
**Official** [2] - 1:25, 53:11

**once** [2] - 12:10, 14:5
**Once** [2] - 14:6, 41:12
**one** [23] - 2:25, 3:23, 8:18, 11:19, 11:25, 15:7, 30:24, 33:19, 36:21, 39:7, 39:8, 40:23, 41:14, 44:3, 44:23, 46:13, 46:14, 47:11, 47:14, 50:6
**One** [1] - 36:21
**open** [3] - 7:14, 19:2, 38:15
**opens** [1] - 15:13
**opinion** [1] - 39:19
**opportunity** [2] - 6:5, 47:25
**opposed** [1] - 35:19
**opposite** [1] - 24:8
**opposition** [3] - 37:8, 38:2, 44:9
**opted** [1] - 50:2
**oral** [1] - 12:3
**order** [3] - 24:13, 37:4, 50:13
**ordered** [4] - 8:23, 12:2, 30:11, 38:23
**Otherwise** [1] - 45:15
**outside** [1] - 5:17
**outstanding** [1] - 48:3
**outwards** [3] - 29:15, 29:18, 29:19
**Outwards** [1] - 29:17
**overlapping** [1] - 42:1
**overt** [2] - 50:3, 50:18

## P

**PAGE** [1] - 52:2
**pair** [1] - 14:13
**pants** [2] - 20:3, 20:10
**panty** [1] - 14:13
**papers** [1] - 45:13
**parked** [1] - 18:5
**parking** [1] - 18:7
**part** [8] - 3:8, 19:25, 34:12, 34:16, 37:15, 37:22, 43:22, 50:17
**passing** [1] - 37:9
**past** [2] - 18:5, 25:17
**patch** [1] - 9:15
**path** [1] - 11:3
**patrol** [3] - 15:23,

16:16, 18:1
**Pause** [3] - 28:2, 31:6, 32:9
**pending** [1] - 47:20
**Pennsylvania** [1] - 5:18
**people** [2] - 40:8, 50:6
**per** [1] - 42:7
**perhaps** [3] - 2:16, 4:11, 48:3
**Perhaps** [1] - 2:18
**Peripheral** [1] - 23:18
**person** [1] - 4:9
**Personally** [1] - 15:12
**picture** [1] - 7:17
**piece** [3] - 42:1, 44:3, 44:14
**pistol** [1] - 40:21
**Pittsburgh** [1] - 5:18
**placed** [2] - 13:25, 14:6
**plan** [2] - 37:16, 37:22
**planning** [1] - 34:8
**pocket** [1] - 14:21
**point** [52] - 2:25, 7:5, 8:5, 8:20, 8:21, 9:8, 9:13, 9:14, 9:25, 10:1, 10:15, 10:17, 11:15, 11:16, 11:18, 12:1, 12:5, 12:7, 12:14, 12:18, 13:13, 13:17, 13:18, 14:7, 14:23, 14:24, 17:19, 21:6, 22:5, 22:14, 22:23, 23:14, 24:12, 24:15, 24:20, 26:13, 26:17, 26:18, 26:20, 26:22, 29:2, 30:25, 31:16, 34:11, 34:22, 37:10, 46:22, 47:8, 48:2, 49:21, 50:8, 50:14
**pointed** [1] - 29:22
**pointing** [2] - 29:14, 29:15, 29:16
**Police** [5] - 5:4, 5:13, 12:8, 14:25, 23:13
**police** [10] - 5:17, 8:22, 9:3, 9:9, 14:3, 38:23, 38:24, 38:25, 39:6, 39:9
**portion** [1] - 7:22, 21:11
**possession** [4] - 42:13, 47:7, 47:10, 47:14
**possible** [1] - 34:19

**precise** [2] - 2:25, 34:9

**preclude** [1] - 46:15

**prejudice** [6] - 35:4, 37:4, 39:14, 44:5, 44:8, 45:7

**preliminary** [2] - 2:19, 35:10

**present** [3] - 27:1, 27:4, 41:5

**presented** [1] - 33:12

**press** [1] - 16:22

**presumption** [1] - 39:11

**pretrial** [2] - 2:15, 48:22

**prevent** [3] - 44:12, 44:16, 46:21

**previously** [1] - 4:22

**probable** [2] - 4:2, 33:14

**probative** [2] - 46:24, 47:2

**proceedings** [1] - 51:5

**process** [2] - 34:13, 34:16

**proffer** [2] - 3:23, 32:20

**proffered** [3] - 33:3, 38:1, 45:18

**properly** [2] - 37:1, 43:22

**prove** [1] - 41:16

**Public** [1] - 2:10

**published** [2] - 39:18, 39:20

**pull** [1] - 22:25

**pulled** [4] - 12:20, 14:13, 29:9, 30:19

**pulling** [2] - 18:6, 18:7

**pulls** [1] - 13:11

**purposes** [6] - 32:12, 32:13, 32:19, 32:25, 45:19

**pursuit** [2] - 11:12, 28:15

**put** [5] - 3:4, 10:8, 12:14, 18:10, 29:7

### Q

**questions** [6] - 15:3, 15:5, 15:15, 31:7, 31:24, 45:14

**quickly** [1] - 28:6

**quite** [1] - 46:23

**Quite** [1] - 36:3

### R

**race** [2] - 17:18, 17:22

**radio** [1] - 16:3

**raise** [1] - 4:18

**raising** [1] - 35:4

**ran** [10] - 9:4, 9:10, 11:2, 11:7, 24:4, 25:7, 25:10, 25:12, 25:17, 39:7

**rather** [1] - 43:20

**reach** [2] - 28:8, 28:9

**reaches** [1] - 13:11

**reaching** [5] - 27:23, 28:11, 28:23, 29:5, 46:21

**reaction** [1] - 28:24

**ready** [2] - 2:15, 47:20

**realized** [1] - 14:7

**really** [6] - 3:25, 34:6, 36:10, 41:11, 45:11, 50:13

**rear** [2] - 13:25, 22:8

**reason** [3] - 33:19, 36:3, 36:10

**reasonable** [3] - 4:2, 33:13, 47:12

**reasons** [1] - 44:1

**REC'D** [1] - 52:6

**received** [4] - 6:11, 14:3, 16:3, 47:24

**recently** [1] - 34:4, 47:7

**recognize** [3] - 6:14, 6:17, 6:22

**record** [6] - 2:20, 4:16, 5:2, 7:21, 24:6, 25:4

**recover** [1] - 14:20

**recovered** [4] - 3:1, 3:3, 3:6, 33:23

**recovery** [1] - 3:18

**redirect** [1] - 31:25

**reentered** [1] - 9:9

**refer** [1] - 26:18

**referred** [1] - 10:13

**regarding** [1] - 40:2

**relate** [1] - 36:16

**related** [1] - 20:12

**relates** [2] - 35:15, 35:17

**relating** [3] - 36:15, 36:20, 36:25

**relation** [1] - 21:7

**released** [1] - 14:24

**relevant** [4] - 36:24, 41:15, 41:21, 42:6

**reliable** [1] - 44:17, 46:21

**relies** [1] - 43:9

**remain** [1] - 4:18

**remember** [1] - 15:11

**remove** [2] - 26:23, 26:24

**removed** [1] - 27:2, 27:7

**rephrase** [1] - 20:16

**reply** [1] - 48:13

**Reporter** [2] - 1:25, 53:11

**REPORTER'S** [1] - 53:1

**reports** [1] - 28:14

**represent** [1] - 15:20

**requires** [1] - 34:22

**residence** [1] - 11:7

**respond** [3] - 6:5, 6:9, 47:25

**responded** [4] - 24:13, 24:21, 27:16, 43:17

**responds** [1] - 37:9

**response** [1] - 48:8

**responses** [1] - 41:25

**restraint** [2] - 49:25, 50:9

**resulting** [1] - 45:7

**retrieval** [1] - 33:25

**retrieved** [1] - 41:5

**Rhode** [5] - 8:7, 8:12, 17:1, 18:3, 18:6

**rights** [1] - 33:24

**rise** [1] - 44:15

**risk** [1] - 46:20

**road** [1] - 18:22

**robbed** [1] - 33:20

**robber** [2] - 40:19, 40:21

**robberies** [21] - 35:13, 36:20, 37:1, 37:18, 37:23, 38:3, 38:9, 39:11, 39:21, 39:25, 40:7, 40:8, 40:17, 40:20, 44:13, 44:22, 45:2, 46:2, 46:9, 46:12, 47:16

**robbers** [6] - 16:19, 38:16, 38:18, 38:21, 38:22, 39:4

**robbery** [40] - 16:4, 35:20, 36:16, 36:17, 38:6, 38:7, 38:10, 38:12, 38:14, 38:17, 38:19, 38:20, 39:2, 39:5, 39:24, 41:6, 41:8, 41:18, 41:20,

41:22, 42:4, 42:5, 42:7, 42:9, 42:10, 42:12, 42:14, 42:15, 42:20, 43:2, 43:3, 43:12, 44:18, 44:21, 45:22, 47:4, 47:5, 47:19

**robbing** [2] - 40:9, 40:11

**RPR** [1] - 1:25

**Rule** [16] - 37:2, 37:7, 37:12, 42:17, 43:8, 43:23, 44:4, 44:6, 44:7, 45:6, 45:7, 46:7, 46:15, 46:18, 47:17

**run** [6] - 8:24, 9:12, 10:18, 10:24, 11:22, 11:24

**running** [15] - 7:14, 7:15, 7:17, 9:15, 10:4, 11:14, 12:9, 17:17, 18:19, 19:12, 20:23, 24:7, 24:16, 25:3, 28:16

### S

**safety** [2] - 13:19, 29:2

**Salem** [19] - 6:6, 8:8, 8:12, 8:24, 9:5, 17:5, 17:6, 17:7, 17:8, 18:3, 18:5, 18:6, 18:12, 21:3, 21:9, 25:8, 25:9, 25:11, 25:13

**satisfies** [1] - 43:7

**Saturday** [1] - 38:12

**saw** [22] - 3:16, 7:13, 7:14, 7:17, 8:2, 8:5, 8:14, 17:13, 17:17, 17:21, 17:24, 18:11, 18:12, 18:19, 18:22, 19:6, 19:19, 20:8, 20:9, 23:18, 28:16, 28:23

**scenario** [3] - 28:25, 29:4, 29:8

**scene** [6] - 3:4, 3:13, 3:15, 7:12, 7:13, 14:19

**schedule** [3] - 48:2, 48:4, 49:12

**scheduled** [1] - 48:2

**scheme** [2] - 37:16, 37:22

**screaming** [1] - 13:14

**screen** [4] - 6:18,

7:6, 10:9, 17:9

**se** [1] - 42:7

**search** [3] - 14:19, 32:15, 33:21

**searched** [1] - 14:17

**seated** [1] - 4:24

**second** [12] - 3:24, 19:6, 20:7, 20:11, 20:12, 24:15, 37:2, 40:4, 41:6, 42:5, 42:7, 47:4

**secondary** [1] - 13:20

**secure** [1] - 13:24

**secured** [1] - 13:20

**see** [22] - 4:14, 6:25, 7:11, 8:15, 10:7, 12:3, 12:4, 12:13, 14:15, 14:17, 18:25, 19:2, 19:4, 19:25, 25:19, 35:18, 36:4, 36:10, 46:13, 48:1, 48:18

**seek** [1] - 34:15

**seem** [1] - 34:21

**semiautomatic** [1] - 40:21

**sense** [3] - 2:19, 46:16, 48:7

**sentencing** [1] - 49:13

**separate** [6] - 16:14, 36:20, 37:1, 37:5, 40:11, 44:13

**serious** [1] - 46:20

**service** [1] - 12:2

**set** [3] - 14:21, 48:21, 48:23

**sets** [2] - 36:15, 47:18

**sever** [2] - 36:19, 47:18

**several** [1] - 30:14

**severance** [4] - 35:7, 36:14, 45:1, 46:19

**SHANTON** [1] - 1:6

**Shanton** [16] - 2:4, 2:11, 4:6, 4:9, 15:21, 32:5, 32:17, 32:24, 33:15, 33:17, 34:11, 34:16, 41:6, 41:17, 43:1, 53:4

**Shanton's** [4] - 33:23, 34:3, 45:20, 47:3

**share** [1] - 37:23

**shoot** [3] - 28:25, 29:3, 29:8

**shoot/don't** [1] - 28:25

**shooting** [1] - 39:9

**shot** [1] - 38:24
**shotgun** [2] - 38:22, 39:3
**shoulder** [2] - 13:4, 13:6
**show** [6] - 6:13, 6:14, 7:16, 18:2, 47:6, 50:9
**showing** [2] - 6:15, 6:17
**side** [4] - 11:8, 24:4, 24:7
**sight** [3] - 13:22, 21:17, 22:17
**significant** [1] - 20:4
**significantly** [1] - 38:17
**silent** [1] - 16:23
**similar** [5] - 37:13, 37:18, 37:24, 44:1, 46:7
**similarities** [1] - 40:25
**similarly** [1] - 40:19
**Simpkins** [2] - 1:25, 53:10
**simply** [1] - 35:19
**single** [1] - 46:11
**singular** [1] - 40:9
**ski** [1] - 19:22
**slow** [2] - 27:25, 28:9
**slowed** [1] - 28:7
**slowly** [3] - 12:15, 12:20, 13:10
**Smith** [1] - 40:16
**sorry** [5] - 15:6, 19:10, 22:1, 31:1, 36:22
**Sort** [1] - 3:11
**sort** [4] - 7:22, 10:5, 10:8, 12:22
**south** [2] - 7:19
**southbound** [7] - 8:24, 9:11, 9:14, 10:2, 10:3, 10:24, 22:8
**Southbound** [1] - 9:5
**specific** [1] - 5:22
**speed** [1] - 27:25
**spell** [1] - 5:1
**Spiegler** [1] - 12:7
**Spigler** [12] - 16:13, 22:24, 23:15, 24:2, 24:6, 25:16, 25:23, 26:7, 27:1, 31:8, 31:11, 31:19
**spun** [1] - 22:9
**squad** [1] - 3:5
**SR** [1] - 1:6
**Sr** [2] - 2:4, 53:4
**stand** [1] - 12:22

**standing** [2] - 4:18, 31:12
**start** [3] - 26:22, 41:12
**started** [2] - 23:10, 28:11
**starts** [1] - 13:12
**state** [2] - 3:1, 5:1
**statement** [4] - 34:3, 34:10, 34:15, 34:17
**statements** [2] - 34:5, 34:7
**STATES** [2] - 1:1, 1:4
**States** [6] - 1:14, 2:4, 39:20, 40:15, 53:3, 53:6
**station** [2] - 3:7, 34:12
**stay** [1] - 11:23
**stepped** [1] - 8:22
**Steve** [1] - 2:6
**Steven** [1] - 1:19
**still** [12] - 3:5, 9:14, 10:4, 11:15, 12:18, 13:14, 29:13, 29:23, 29:24, 43:5, 50:12
**stipulate** [2] - 32:11
**stipulated** [1] - 3:22
**stocking** [2] - 14:8, 14:10
**stolen** [3] - 45:21, 47:7, 47:14
**stop** [6] - 4:6, 8:23, 11:13, 24:13, 33:14, 33:21
**stopped** [14] - 4:9, 11:20, 11:23, 11:25, 12:10, 12:11, 18:18, 18:23, 25:15, 25:21, 26:24, 27:17, 32:6, 32:8
**street** [1] - 21:20
**stretch** [2] - 36:2, 45:25
**subject** [8] - 12:9, 19:13, 19:18, 20:6, 20:7, 20:11, 20:12, 26:12
**subjects** [3] - 17:17, 17:19, 18:19
**submit** [2] - 37:7, 45:15
**successful** [1] - 46:14
**suggested** [1] - 45:25
**suggesting** [1] - 32:11
**summarize** [1] - 40:14

**support** [1] - 43:9
**supports** [1] - 44:4
**suppose** [1] - 4:8
**suppress** [6] - 3:8, 32:14, 33:6, 34:1, 34:2, 48:9
**suppression** [1] - 4:1
**surprising** [1] - 40:6
**surrender** [1] - 27:15
**surrendered** [2] - 27:12, 39:7
**surrounding** [1] - 10:11
**suspect** [14] - 19:7, 24:15, 24:25, 25:20, 25:22, 26:19, 26:22, 27:1, 28:11, 31:1, 31:8, 31:12, 31:16
**suspects** [2] - 18:22, 24:10
**suspicion** [2] - 4:2, 33:13
**Susquehanna** [7] - 6:6, 6:24, 6:25, 7:8, 7:23, 16:4, 16:5
**Sustained** [1] - 26:3
**sworn** [1] - 4:22

**T**

**tangible** [3] - 4:1, 33:6, 34:1
**tellers** [1] - 16:22
**ten** [1] - 30:17
**terms** [1] - 3:12
**test** [1] - 46:16
**testified** [4] - 4:22, 17:12, 17:15, 23:21
**testify** [4] - 3:17, 3:19, 3:20, 50:7
**testimony** [4] - 2:16, 2:17, 2:20, 4:11
**THE** [63] - 1:1, 1:2, 2:2, 2:8, 2:12, 2:24, 3:10, 3:25, 4:6, 4:17, 4:18, 4:24, 5:3, 5:5, 7:5, 12:25, 15:4, 15:8, 19:10, 19:13, 20:11, 24:17, 25:10, 26:3, 30:6, 30:9, 31:5, 31:25, 32:2, 32:13, 32:19, 33:3, 33:11, 34:14, 34:21, 35:2, 35:7, 35:23, 36:2, 36:14, 40:2, 41:2, 41:11, 42:8, 45:9, 45:17, 46:3, 48:1, 48:8, 48:12, 48:16,

84:24, 48:25, 49:8, 49:10, 49:11, 49:12, 49:14, 49:17, 50:11, 50:21, 50:24, 51:2
**threat** [1] - 39:3
**threaten** [1] - 29:12
**threatened** [1] - 38:21
**three** [1] - 16:11
**today** [3] - 2:14, 3:12, 33:12
**together** [6] - 11:15, 37:25, 43:4, 45:2, 45:3, 47:16
**took** [2] - 9:10, 11:25
**toss** [1] - 13:15
**tossed** [1] - 13:21
**totally** [1] - 39:5
**touch** [1] - 7:5
**towards** [18] - 8:19, 12:12, 12:15, 21:10, 23:5, 25:7, 25:8, 25:9, 25:10, 25:13, 27:24, 29:3, 29:13, 29:14, 29:19, 29:21, 29:24, 39:12
**transaction** [4] - 37:14, 37:19, 43:23, 43:24
**transcript** [1] - 53:2
**transported** [1] - 14:25
**trial** [7] - 32:12, 36:9, 43:2, 46:20, 48:21, 49:4, 50:7
**trials** [1] - 37:5
**tried** [3] - 37:25, 45:2, 45:3
**true** [1] - 53:6
**try** [2] - 7:3, 47:15
**trying** [2] - 18:21, 49:20
**turn** [3] - 2:18, 6:1, 9:19
**turned** [4] - 12:15, 26:9, 29:13, 33:14
**turning** [1] - 29:24
**two** [36] - 5:21, 7:13, 17:13, 17:17, 17:19, 17:24, 18:19, 21:3, 22:1, 23:25, 24:11, 35:13, 36:20, 36:24, 37:1, 37:3, 38:3, 39:15, 39:25, 40:5, 40:8, 40:10, 40:11, 40:17, 40:24, 43:10, 44:4, 44:13, 46:1, 46:8, 46:11, 46:25, 47:15, 50:5
**Two** [2] - 16:11, 40:5

**types** [1] - 39:25
**Tyson** [1] - 48:16

**U**

**Umlauf** [1] - 2:7
**unchallenged** [1] - 33:12
**Under** [1] - 37:12
**under** [9] - 34:19, 37:2, 37:7, 42:17, 42:23, 45:6, 46:7, 46:15, 46:18
**underneath** [1] - 10:7
**uniform** [1] - 8:25
**unique** [2] - 39:22, 40:10
**UNITED** [2] - 1:1, 1:4
**United** [6] - 1:14, 2:4, 39:20, 40:15, 53:3, 53:6
**Unless** [2] - 4:8, 36:9
**unless** [4] - 2:19, 28:20, 36:3, 46:19
**unmarked** [1] - 9:2
**unpublished** [1] - 39:18
**unreported** [1] - 40:13
**unusual** [1] - 46:10
**up** [13] - 9:11, 9:17, 10:19, 12:15, 17:10, 17:12, 21:21, 22:25, 23:19, 27:8, 30:8, 31:7, 31:12
**uphill** [1] - 46:5

**V**

**valiantly** [1] - 46:4
**vehicle** [1] - 9:9
**vehicles** [1] - 40:24
**verbal** [3] - 11:13, 12:13, 12:18
**verdict** [1] - 46:21
**versus** [1] - 2:4
**view** [4] - 7:2, 22:21, 36:1, 36:2
**violate** [1] - 33:23
**violation** [1] - 47:17
**vision** [1] - 23:18
**VS** [1] - 1:5
**vs** [1] - 53:3

**W**

**waist** [2] - 12:19,

27:24
**waistband** [10] - 26:23, 26:24, 27:2, 27:7, 28:12, 28:24, 29:9, 30:20, 32:7, 45:20
**walk** [1] - 27:6
**weapon** [3] - 12:2, 13:20, 28:20
**wearing** [15] - 3:5, 11:19, 11:20, 11:21, 14:8, 14:11, 19:18, 20:2, 20:5, 20:8, 20:9, 20:19, 32:6, 40:19
**week** [4] - 38:11, 48:17, 48:24, 49:5
**westbound** [4] - 9:24, 11:9, 22:10
**Westbound** [2] - 17:7, 17:8
**wet** [1] - 9:20
**wetness** [1] - 22:9
**white** [2] - 10:8, 10:9
**wielded** [1] - 40:21
**wife** [1] - 40:24
**withdrew** [1] - 32:7
**witness** [7] - 3:23, 3:24, 4:21, 7:21, 15:3, 30:18, 40:22
**WITNESS** [3] - 5:3, 19:13, 52:2
**witnesses** [1] - 3:12
**words** [1] - 18:10
**wrap** [1] - 30:8
**written** [1] - 2:22

## Y

**yard** [1] - 11:8
**year** [2] - 5:15, 5:20
**years** [1] - 5:21
**yelling** [1] - 11:13
**yellow** [1] - 25:1
**yesterday** [1] - 2:13